31 A.3d 271

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
STANFORD YOUGH, DEFENDANT–RESPONDENT.

Argued September 27, 2011—Decided November 30, 2011.

*Marc A. Festa*, Senior Assistant Prosecutor, argued the cause for appellant (*Camelia M. Valdes*, Passaic County Prosecutor, attorney).

*Carolyn V. Bostic*, Designated Counsel, argued the cause for respondent (*Joseph E. Krakora*, Public Defender, attorney).

*Hillary K. Horton*, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney).

Justice ALBIN delivered the opinion of the Court.

Trials are not perfectly orchestrated productions. The testimony of witnesses may not always be predictable, particularly in criminal cases where depositions are not a typical tool of discovery. On the stand, a witness may give testimony that is different from or more expansive than an out-of-court statement recorded by the police. In many instances, discrepancies will advantage a defense attorney attempting to discredit a witness—but not always. Every witness's digression from a prior statement cannot be grist for the granting of a new-trial motion.

In this case, the victim of a robbery testified at trial that he observed defendant more times than he had indicated in his statement to the police and, in response to cross-examination, gave more details about his sightings of defendant. A split panel of the Appellate Division reversed defendant's robbery conviction, finding that a mistrial should have been granted because the victim suggested at trial for the first time that defendant threatened or intimidated him following the robbery and that no curative instruction was given. We do not believe that a fair reading of the victim's testimony before the jury implicates post-robbery bad-act evidence or that defendant was unfairly prejudiced by that testimony. Although the victim testified at a hearing out of the presence of the jury that he had observed and encountered defendant after the robbery, because of defense counsel's claim of

surprise, the prosecutor was prohibited from revealing that information to the jury.

We are in agreement with the panel's dissenting judge who concluded that the trial court did not abuse its discretion in declining to grant a mistrial. Accordingly, we reverse the Appellate Division's grant of a new trial and reinstate defendant's conviction.

## I.

On August 3, 2007, a Passaic County jury found defendant Stanford Yough guilty of second-degree robbery in violation of *N.J.S.A.* 2C:15–1(a)(1). The trial court determined that defendant was a persistent offender, *N.J.S.A.* 2C:44–3(a), and imposed a fifteen-year term of imprisonment subject to the No Early Release Act, *N.J.S.A.* 2C:43–7.2.

## A.

Defendant's conviction rests primarily on the trial testimony of Cesar Alva, who was robbed outside a U.S. Chicken restaurant in the city of Paterson in the early morning hours of October 10, 2005.[1] At approximately 1:00 a.m., Alva entered the U.S. Chicken restaurant and was approached by defendant who asked him for fifty cents. Alva told defendant he did not have the change and placed his order. When paying the bill, Alva took out his wallet, which was crammed with five-dollar bills totaling approximately $300.00. Alva attempted to shield the transaction and his wallet from defendant's prying eyes. After Alva paid for his food, defendant approached him again, this time requesting a dollar. Alva said that he did not have one, but placed fifty cents on a nearby shelf. Defendant took the change and went outside where he conferred with two other men. From inside the restaurant, Alva could see that defendant was pointing at him.

---

[1] The statement of facts presented here is based on the testimony at trial.

After picking up his order, Alva exited the restaurant and walked towards his car, which was parked a short distance away. Alva had not gone more than twenty feet when defendant and his two cohorts knocked him down and began pummeling and kicking him. Then, defendant ordered the other two men to stop the assault and demanded that Alva turn over his wallet. After Alva did so, defendant rifled through the wallet, causing the bills to spill to the ground. The three men scrambled to collect the scattered five-dollar bills and argued over the division of the spoils. Defendant returned to Alva his empty wallet, and the three men left the scene.

Immediately after the robbery, Alva drove to a nightclub where he had spent time earlier in the evening. There, he summoned the police. Shortly afterwards, Paterson Police Officer Ivan Hicks arrived and took down information from Alva about the robbery. Alva described the man who stalked and robbed him as "a black male, about 5'11", 200 pounds, bald head, very light complex[ion] ... wearing a grey sweat suit, and in his 20's." [2]

One week later, on October 17, Alva went to the Paterson Police Department where he looked through as many as seven thick books of photographs. After twenty-five minutes, Alva selected a photograph of defendant, stating that he had "no doubt" that defendant was the man who had robbed him.[3] Alva did not identify the two other men who assisted defendant in attacking him. Two days later, Alva gave a statement to Detective Dean Barone in which he confirmed his identification of defendant.

---

[2] At the time of the robbery, defendant was forty-seven years old. The description given by Alva of his assailant was otherwise consistent with defendant's physical characteristics. Defendant is a light-skinned African–American. Six months before trial, the records of the Passaic County Jail listed defendant as six feet tall and weighing 210 pounds. By the time of trial, defendant had grown hair and a beard.

[3] The photograph of defendant was taken when he was forty-five years old.

## B.

In addition to the above trial testimony, on direct examination, Alva stated that he was certain that defendant was one of his attackers and identified him in court. Before making that identification, Alva indicated that he had seen defendant in Paterson "ten, fifteen times. Many times." [4] In the context of the questioning, the clear impression was that those sightings occurred before the robbery.

On cross-examination, defense counsel highlighted the inconsistency between Alva's direct testimony and Alva's statement to Detective Barone two years earlier that he had observed defendant "two or three, maybe more" times before the robbery. The colloquy between defense counsel and Alva is the centerpiece of this appeal.

[Defense Counsel]: And do you remember saying two or three, maybe more?

[Alva]: Yes.

[Defense Counsel]: You remember saying two or three, maybe more?

[Alva]: Yes, yes, yes.

[Defense Counsel]: But the Prosecutor asked you the same question; and you said, ten, maybe fifteen times?

[Alva]: Because he—I see him many times on the street. And he come and he point at me like this and talk to another people like this, like this, (makes growling sound) like this.

[Defense Counsel]: And that explains the—

[Alva]: He followed me and—okay.

[THE COURT]: No, no. You can keep answering. You—you can explain your answer.

[Alva]: Well, another day I saw him, he was jogging.

[Defense Counsel]: Your Honor, he's not—

[Alva]: Very dressed—

[Defense Counsel]:—Your Honor—

[Alva]:—dressed very nice. Then, he very nicely dressed. He changed from anything.

[Defense Counsel]: Your Honor, I'd like to be heard about—

[Alva]: And, when he—when he choked me—

---

[4] Defendant lived in Paterson near the U.S. Chicken restaurant.

THE COURT: You want to be heard?

[Defense Counsel]: Yes.

THE COURT: Alright.

[Alva]:—and he—

THE COURT: Alright. Timeout,—

[Alva]:—he go to the store, he—

THE COURT:—Mr. Alva.

[Defense Counsel]: Yeah. I want to be heard.

THE COURT: Ladies and gentlemen, please go in the jury room.[5]

Out of the presence of the jury, defense counsel expressed concern that Alva was going to say that he had seen defendant since the robbery. Counsel complained that such testimony would undercut his representations to the jury in his opening statement that Alva would see defendant for the first time ever in the courtroom. Counsel also accused the prosecutor of violating the State's discovery obligation by not advising him in advance that Alva might testify that he had seen defendant after the robbery. The prosecutor denied knowing in advance that Alva would give testimony in conflict with his statement to Detective Barone.

The trial court then conducted a *Rule* 104 hearing to determine exactly what testimony Alva would give to the jury about prior sightings of defendant.[6] At the hearing, Alva explained that he saw defendant ten or fifteen times, although it was unclear whether all of those times were *after* he gave his statement to Detective Barone. On many of the occasions after the robbery, defendant did not see Alva. Although Alva never spoke to defendant, one time defendant said to him, "Hello, buddy," and walked away to talk to other people. Alva was not certain whether he had told the prosecutor about his observations of and interactions with defendant following the robbery. At no point in his *Rule* 104

---

[5] This colloquy comes from the official court transcript prepared from the audiotape of the trial by a transcription service.

[6] *N.J.R.E.* 104 allows the trial court to conduct a hearing out of the presence of the jury to determine the admissibility of evidence.

testimony did Alva mention that defendant had choked or threatened him in any encounter after the robbery.

At the conclusion of the hearing, defense counsel moved for a mistrial, claiming that Alva's testimony before the jury that defendant was "pointing at him at some other time" was the equivalent of "threatening him" and "implied witness tamper[ing]." Disagreeing with that characterization of Alva's testimony, the court denied the mistrial motion. The court believed that there was an ambiguity in Alva's testimony before the jury and gave defense counsel the opportunity of exploring the conflict between Alva's statement to the police and his courtroom testimony. Although defense counsel was given the option of opening the door into the area of Alva's post-robbery sightings of defendant, he declined to accept that invitation. Indeed, defense counsel stated that if the prosecutor left the area alone, then he did not see a discovery violation "yet."

The court then barred the prosecutor from questioning Alva about the times he had seen defendant since the robbery, noting that, in his opening statement, defense counsel told the jury that Alva had not seen defendant in the two years since identifying him as the robber. The court specifically instructed Alva not to mention that he saw defendant after he gave his statement to the police.

The remainder of the cross-examination of Alva probed the merits of his identification of defendant, including discrepancies between Alva's description of defendant at the time of the robbery and his appearance at trial. No mention was made of what counsel had learned during the *Rule* 104 hearing—that, in fact, Alva had seen defendant on a number of occasions after the robbery. Alva was not permitted to explain the conflict between his statement to Detective Barone and his in-court testimony.

On summation, defense counsel made the most of the conflict in Alva's testimony as it appeared to the jury. Counsel argued that Alva told the police seven days after the robbery that he had only seen defendant "two or three times, maybe more" and then

embellished his in-court testimony by stating that he had seen him ten to fifteen times. Counsel added that Alva, having convinced himself of the correctness of his identification of defendant and his guilt, was invested in the outcome and wanted the jury to convict defendant. Neither defense counsel nor the prosecutor intimated that Alva had seen defendant at any time after the robbery. Indeed, the prosecutor did not even address the number of times Alva claimed to have observed defendant before the robbery. Moreover, in charging the jury on identification, the trial court instructed the jury that it "may also consider Mr. Alva's testimony that he knew of the perpetrator from having seen him *before* this incident." (Emphasis added). The trial court did not suggest that Alva had observed defendant *after* the robbery.

Defense counsel did not object to the court's jury charge or request any limiting instructions concerning the jury's use of Alva's testimony. After deliberating for approximately one hour, the jury convicted defendant of robbery.

## C.

In an unpublished opinion, a split Appellate Division panel reversed defendant's conviction. The two-judge majority held that the trial court should have granted defendant's motion for a mistrial based on Alva's unresponsive and prejudicial answers to defense counsel's cross-examination. The majority maintained that the jury could have reasonably inferred from Alva's testimony that defendant had engaged in post-robbery acts of intimidation or witness tampering. Thus, the jury was exposed to inadmissible bad-acts evidence. In addition, the majority asserted that the post-robbery sightings of defendant improperly bolstered Alva's identification of defendant. The majority recognized that defense counsel did not object either to "Alva's testimony about the pointing, choking, and growling" as prior bad-acts evidence or to the jury charge, and did not seek a curative charge. Nevertheless, the majority concluded that "the inadmissible and highly prejudicial evidence" so undermined the fairness of the trial that

cautionary or limiting instructions were not a feasible alternative. The majority remanded for a new trial.

In her dissent, Judge Espinosa emphasized that Alva was subjected to a thorough cross-examination about inconsistencies in his description of defendant and the number of times he claimed to have seen him, and that the jury had a "full and fair opportunity to assess the credibility of Alva's identification." She noted that the now challenged portion of the cross-examination was part of a choppy colloquy, interspersed with interruptions, during which "Alva made the fleeting comment, 'when he choked me.'" She added that this passing comment "was not even part of a completed sentence" and could hardly be deemed prejudicial, given Alva's testimony that defendant "repeatedly punched and kicked" him during the robbery. She pointed out that defense counsel's failure to object or request a curative instruction to the reference to choking or growling represented a strategic decision. In light of Alva's observation of defendant over an extended period of time and his unwavering identification of defendant, as well as the deference due to evidential rulings, Judge Espinosa concluded a mistrial was not required "to prevent an obvious failure of justice." (Internal quotation marks omitted).

## II.

The State appealed as of right based on the dissent in the Appellate Division. *R.* 2:2–1(a)(2). The issues before us are limited to those raised in the dissenting opinion.[7] *Ibid.*

The State submits that the Appellate Division erred in concluding that the jury could reasonably have inferred that Alva, at various times, observed, encountered, or was threatened by defendant *after* the robbery. The State argues that the trial court properly ruled that Alva's testimony was responsive to defense counsel's cross-examination. The State also points out that the

---

[7] Defendant raised ten other issues that the Appellate Division did not address in light of the grant of a new trial.

transcript notation referring to Alva's testimony—"makes growling sound"—was a description of defendant speaking, perhaps in a garbled manner, to others, not of defendant growling at Alva. The State notes that defendant made no objection and sought no curative instruction, suggesting that he perceived no error or prejudice and that he was making a strategic decision to his advantage. The State claims that the strength of its proofs, in particular Alva's identification, rendered any error harmless.

Amicus curiae the New Jersey Attorney General urges this Court to reverse because the appellate-panel majority did not properly defer to the trial court's decision not to grant a mistrial. Rather, the Attorney General asserts that the majority merely substituted its judgment based on a "cold record," wrongly finding that Alva's answers to cross-examination questions "were unresponsive and possibly suggestive of prior bad acts." She contends that the "record is devoid of any suggestion that defendant tried to intimidate Alva after the robbery." For example, she argues that the majority merely speculated that Alva's remark about being choked referred to a post-robbery act when it could have been inferred that the choking was part of the charged act of robbery. The Attorney General concludes that the identification was trustworthy, that the jury was properly instructed on the law, and that defendant vigorously challenged the overwhelming evidence of guilt at every stage of the trial.

Defendant asks us to affirm the Appellate Division's grant of a new trial. Defendant contends that Alva's testimony about his post-robbery encounters, including an assault and threats by defendant, constituted inadmissible other-crimes evidence under *N.J.R.E.* 404(b). Even if admissible, he asserts that the failure to give limiting instructions was fatal to a fair trial. Because the trial court found that Alva's cross-examination responses were "invited," not "improper," or "prejudicial," defendant insists a request to strike testimony or for a curative instruction would have been an exercise in futility. He also maintains that the case against him rested solely on the reliability of a questionable

identification and that the Appellate Division's finding of manifest injustice fully warranted the grant of a new trial.

## III.

### A.

The primary issue to be determined is whether the trial court erred in denying defendant's motion for a mistrial. This case is a reminder that a trial is not a perfectly scripted and choreographed theatrical presentation; rather, it is an extemporaneous production whose course is often unpredictable given the vagaries of the human condition. Attorneys will sometimes pose inartfully crafted questions, and even the most precise question may bring an unexpected response from a witness. In any trial, "inadmissible evidence frequently, often unavoidably, comes to the attention of the jury." *State v. Winter,* 96 *N.J.* 640, 646, 477 *A.2d* 323 (1984).

Moreover, attorneys making strategic decisions based on information within their exclusive ken—information oftentimes unknown to the trial judge—are in the best position to gauge when to object to a perceived error and whether to request a curative instruction. *See State v. Witte,* 13 *N.J.* 598, 611–12, 100 *A.2d* 754 (1953). Whether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters "peculiarly within the competence of the trial judge." *Winter, supra,* 96 *N.J.* at 646–47, 477 *A.2d* 323. The grant of a mistrial is an extraordinary remedy to be exercised only when necessary "to prevent an obvious failure of justice." *State v. Harvey,* 151 *N.J.* 117, 205, 699 *A.2d* 596 (1997). For that reason, an appellate court should not reverse a trial court's denial of a mistrial motion absent a "clear showing" that "the defendant suffered actual harm" or that the court otherwise "abused its discretion." *State v. LaBrutto,* 114 *N.J.* 187, 207, 553 *A.2d* 335 (1989). Furthermore, when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new

trial unless the error was "clearly capable of producing an unjust result." *See R.* 2:10–2; *State v. Frisby,* 174 *N.J.* 583, 591, 811 *A.*2d 414 (2002) (holding that improper admission of hearsay warranted new trial because it was "clearly capable of producing an unjust result" (internal quotations omitted)).

## B.

Defense counsel's mistrial motion was premised on his claim of surprise and prejudice following Alva's testimony at the *Rule* 104 hearing (out of the jury's presence) when Alva made clear that he had observed defendant many times after the robbery. After the hearing, defense counsel suggested for the first time that defendant's "pointing at [Alva] at some other time" was tantamount to threatening or tampering with a witness. However, for purposes of our analysis, all that matters is what the jury heard and not what counsel and the court learned after the *Rule* 104 hearing.

In explaining why he told Detective Barone that he saw defendant "two or three, maybe more times" and later stated on direct examination that he saw defendant ten or fifteen times, Alva testified before the jury: "I see him many times on the street. And he come and he point at me like this and talk to another people like this, like this, (makes growling sound) like this." Alva made no mention that these were post-robbery sightings or encounters.

First, it bears noting that defense counsel declined to answer the trial court's question whether he had interviewed Alva before he cross-examined the witness. The court's question was posed after defense counsel had accused the prosecutor of withholding discovery—of not telling defense counsel that Alva claimed to have observed defendant a number of times after the robbery. It would have been simple enough for defense counsel to have responded that he had not interviewed Alva or, if he had interviewed him, that Alva was not forthcoming with the information that he sprung on him before the jury. If defense counsel is

claiming surprise, he should not hesitate to assure the court that he has a good faith basis for making such a claim.

We need not speculate on whether defense counsel was surprised because ultimately we conclude the jury could not have reasonably inferred that Alva had an encounter with, or was threatened by, defendant after the robbery. We reach that conclusion based on the testimony that the jury actually heard, defense counsel's argument to the jury, and the court's charge to the jury. All the jury heard and could have reasonably understood was that during the initial investigation Alva told Detective Barone that he had seen defendant two, three, or more times before the robbery, and during his trial testimony he had increased the number of sightings and/or encounters to ten to fifteen.

■■■ On direct examination, when asked how many times he had seen defendant before the robbery, Alva responded, "ten, fifteen times. Many times." Defense counsel understandably attempted to probe and exploit the inconsistency between that testimony and Alva's earlier statement to Detective Barone. As part of the examination process, however, a witness is generally allowed to explain the reason for any inconsistency between a prior statement and his present testimony. *See State v. Williams,* 184 *N.J.* 432, 452, 877 *A.2d* 1258 (2005) (citing *N.J.R.E.* 613(b), which states "[e]xtrinsic evidence of a prior inconsistent statement made by a witness may in the judge's discretion be excluded unless the witness is afforded an opportunity to explain or deny the statement. . . ."). Defense counsel's questioning invited a response from Alva. Counsel will not always get the response he expects or wants. Alleged errors induced by counsel "ordinarily are not a basis for reversal on appeal." *State v. Corsaro,* 107 *N.J.* 339, 345, 526 *A.2d* 1046 (1987) (internal quotations and citations omitted); *State v. Simon,* 79 *N.J.* 191, 205, 398 *A.2d* 861 (1979) ("Trial errors originating with defendants ordinarily cannot serve as a vehicle for reversal on appeal.").

The unruly colloquy between defense counsel and the witness, whose native language is Spanish, with interjections from the court, resulted in all three talking over one another. At this point, Alva's testimony became a series of broken and disjointed sentences. Defense counsel may have suspected that Alva, if given free rein, would alert the jury that the reason for the discrepancy between the in- and out-of-court statements was that he had observed defendant many times after the robbery. However, the examination 'terminated before Alva could make that point. Only at the *Rule* 104 hearing did the truth become clear that Alva had sightings and encounters with defendant after the robbery.

The court gave defense counsel the choice of exploring before the jury the issue of whether Alva saw defendant after the robbery. Defense counsel rejected that invitation and was content when the prosecutor was barred by the court from correcting the discrepancy. The prosecutor in summation never intimated in any way that Alva had observed defendant after the robbery. On the other hand, defendant was permitted to fully exploit a fictitious discrepancy, arguing in summation that Alva was so convinced of defendant's guilt that he was willing to grossly exaggerate the number of times he saw defendant before the robbery. The defense also received the benefit of a favorable jury charge. The jury was instructed that it could "consider Alva's testimony that he knew of the perpetrator from having seen him *before* this incident." (Emphasis added).

If defense counsel believed that the jury had been exposed to post-robbery, other-crimes evidence in violation of *N.J.R.E.* 404(b),[8] he could have asked for a curative or limiting instruction.

---

[8] *N.J.R.E.* 404(b) provides:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

The failure to do so suggests that defense counsel believed that he had constrained the post-robbery narrative to his advantage or that any possible error "was actually of no moment." *State v. Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971). Defendant therefore should not be heard to complain now.

That the trial court allowed a fiction—even if beneficial to defendant—to be presented to the jury is troubling. The jury is the ultimate judge of the facts and should not be shielded from the truth, however untidy it may be. The jury was entitled to hear Alva's explanation that the ten or fifteen times he observed defendant included sightings *after* the robbery. That evidence would have been no less probative than if the ten or fifteen times had been before the robbery. Furthermore, because the defense was misidentification, defense counsel could have argued that Alva, having mistakenly identified defendant during the photo line-up, merely observed the man he misidentified, perpetuating and reinforcing the error.

The notion that Alva saw defendant after the robbery was not thoroughly at odds with defense counsel's opening statement. In his opening statement, defense counsel professed: "I was hoping, this will be the first time he's actually seen Mr. Yough, unless you believe he didn't make a mistake almost 2 years ago. But this will be the first time he actually says I'm pretty sure that's the man." Although defense counsel may have hoped that Alva would see defendant for the first time in court, one's hopes are not always realized. Even had it been clear to the jury that Alva had observed and encountered defendant after the robbery, defense counsel would have been free to emphasize that Alva inexplicably withheld the information of the post-robbery sightings from the prosecutor and therefore from the defense as well. Counsel and the trial court were not without options to deal with this unexpected turn of events.

We understand that the trial court admirably attempted to do its best to eliminate the unfairness of any surprise to defendant. The point to be made here is that the trial court and counsel could

have managed to address the truth before the jury without damaging defendant's prospects for a fair trial. We caution judges that, however unpredictably a case may play out, the jury generally is entitled to the true picture of the case. The trial court has at its disposal a number of options to ensure fairness if defense counsel is truly surprised, including allowance for a brief adjournment, the giving of limiting and curative instructions, and, in the most extreme of circumstances, where irreparable prejudice will be suffered, the grant of a new trial.

## C.

Defendant argued for the first time on appeal that he was prejudiced by post-robbery evidence of intimidation by Alva. We already have concluded that Alva's testimony during the colloquy with defense counsel could only be understood by the jury as referring to pre-robbery sightings of defendant. We must take issue, however, with the mistaken characterization of Alva's testimony by both defendant and the Appellate Division majority. At no time did Alva testify that defendant had "growled at him" on the street. Rather, Alva inarticulately stated: "I see him many times on the street. And he come and he point at me like this *and talk to another people like this, like this,* (makes growling sound) like this." (Emphasis added). Clearly, in context, the court transcriber is describing some kind of noise or garbled speech that Alva stated defendant made to another person. In addition, Alva's testimony, "when he choked me,"—words suspended and disembodied in an uncompleted sentence—could only have been understood (if at all) in the context of the robbery of Alva during which he was beaten and punched.[9]

---

[9] Although we do not suggest that defendant threatened or intimidated Alva after the robbery, if he had done so, such conduct would be admissible to demonstrate consciousness of guilt under *N.J.R.E.* 404(b). *See, e.g., State v. Williams,* 190 *N.J.* 114, 125, 129, 919 *A.*2d 90 (2007) (holding that jury may consider defendant's cover-up attempts as evidence of guilty conscience).

■ The State has challenged the accuracy of the transcript with regard to the characterization of Alva making a "growling sound." Given our review of that portion of the sound-recorded proceedings, there may be some basis to the State's challenge. However, any such challenge to the accuracy of the trial record should have been brought before the trial court or the Clerk of the Appellate Division.

■ *Rule* 2:5–5(a) provides that "[a] party who questions whether the record fully and truly discloses what occurred in the court or agency below shall . . . apply on motion to that court or agency to settle the record." The trial court is clearly in the best position to settle the record, particularly when the record is a stenographic transcript and in many instances when it is a sound recording. This is especially true where the court must construe not actual words but sounds made by the witness. Unlike an appellate court, a trial judge has the "opportunity to hear and see the witnesses," which includes observing gestures and facial expressions. *See State v. Locurto*, 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (quoting *State v. Johnson*, 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)).

■ Another avenue available to a party who challenges the accuracy of a sound or video recording is to request the clerk of the appellate court to settle the record in accordance with *Rule* 2:5–5(a).[10] The rationale behind this rule is that the Appellate Division Clerk's office, in "dealing with transcription services[, has] developed an expertise in comparing [a sound and video]

---

[10] *Rule* 2:5–5(a) provides, in pertinent part, that

[i]f the proceedings were sound or video recorded, a party, prior to moving for an order settling the record, may, on notice to all other parties, request the clerk of the court in which the appeal is pending to review the tape thereof to determine whether a particular portion of the transcript accurately transcribed what was said by a participant. The clerk shall notify all parties of the determination, requesting that any objection be submitted in writing within ten days of the notification. If no timely written objection is received, the transcript shall be deemed so corrected, and a copy of the notification shall be filed.

recording with the transcript." Pressler & Verniero, *Current N.J. Court Rules,* comment 1 on *R.* 2:5–5 (2012).

Having noted the proper methods for settling the record, we are satisfied that to do so here would not be of any moment and would not alter the outcome of the case. Accepting the accuracy of the transcript, the "growling sound" that Alva purportedly made still does not inure to defendant's benefit. We are satisfied that Alva's responses during the direct or cross-examination did not entitle defendant to a mistrial and that no errors occurred during those exchanges that were "clearly capable of producing an unjust result." *R.* 2:10–2.

## IV.

As mentioned earlier, defense counsel will not always get the answers he expects on cross-examination. Here, however, because defense counsel claimed surprise, the court acceded to counsel's request to withhold from the jury testimony that would have explained the discrepancy between Alva's statement to police and his in-court testimony. As a consequence, defense counsel was able to exploit inconsistencies without fear of contradiction. That hardly worked to defendant's detriment. Moreover, defense counsel did not object to the court's jury charge or request any limiting or curative instruction.

The trial court did not abuse its discretion in denying defendant's motion for a mistrial. With regard to the matter presented to us, we do not find any error "clearly capable of producing an unjust result." *R.* 2:10–2. We reverse the judgment of the Appellate Division granting defendant a new trial and remand to that court for consideration of the remaining issues raised in his initial appeal.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, ALBIN, HOENS, PATTERSON—5.

*Not Participating*—Justices LaVECCHIA and WEFING (temporarily assigned).