# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3084-18T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

R.J.M.,

    Defendant-Appellant.

_____

> Submitted November 9, 2020 – Decided December 15, 2020
>
> Before Judges Messano and Suter.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 10-11-1174.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).
>
> Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Marc A. Festa, Senior Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A Passaic County grand jury indicted defendant, R.J.M., for crimes that allegedly occurred between August 2004 and September 2009, specifically, first-degree aggravated sexual assault of E.V. (Eve), N.J.S.A. 2C:14-2(a)(1) (count one); two counts of second-degree sexual assault of Eve, N.J.S.A. 2C:14-2(b) and -2(c)(4) (counts two and three); fourth-degree criminal sexual contact of Eve, 2C:14-3(b) (count four); second-degree endangering the welfare of Eve, N.J.S.A. 2C:24-4(a) (count five); and, crimes allegedly occurring between May 2004 and September 2009, specifically, first-degree aggravated sexual assault of Eve's sister, A.M. (Alice), N.J.S.A. 2C:14-2(a)(1) (count six); second-degree sexual assault of Alice, N.J.S.A. 2C:14-2(b) (count seven); and second-degree endangering the welfare of Alice, N.J.S.A. 2C:24-4(a) (count eight).[1] The jury could not reach a verdict on counts one, two, four, six, and seven, acquitted defendant of counts three and five, and found him guilty of the lesser-included charge of third-degree endangering in count eight.[2]

---

[1] We use initials and pseudonyms for defendant and the children pursuant to Rule 1:38-3(c)(9). Alice and Eve share the same mother but have different fathers.

[2] The jury acquitted defendant of the more serious charge of second-degree endangering, concluding by its verdict that defendant did not "hav[e] a legal duty for the care of [Alice]," nor had he "assumed responsibility for [her] care[.]" N.J.S.A. 2C:24-4(a)(1).

A-3084-18T1

The judge sentenced defendant to a three-year term of imprisonment, and the State dismissed those counts on which the jury could not reach a verdict. This appeal followed.

Defendant raises the following points for our consideration:

Point One

THE IMPROPER ADMISSION OF EXPERT TESTIMONY AS TO CHILD SEXUAL [ABUSE] ACCOMMODATION SYNDROME REQUIRES THE VACATION OF DEFENDANT'S CONVICTION. (Not raised below)

Point Two

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION FOR A MISTRIAL FOLLOWING THE REPEATED OUTBURSTS OF WITNESS A.M., WITHOUT INQUIRING OF THE INDIVIDUAL JURORS WHETHER THEY HAD BEEN PREJUDICIED BY THE EPISODE.

Point Three

DEFENDANT'S SENTENCE OF THREE YEARS IMPRISONMENT IS EXCESSIVE[] AND WAS THE RESULT OF THE IMPROPER APPLICATION OF THE APPLICABLE AGGRAVATING AND MITIGATING FACTORS.

Defendant was tried before the Court issued its seminal opinion in State v. J.L.G., 234 N.J. 265, 272 (2018), which held that Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence "no longer . . . has a sufficiently

reliable basis in science to be the subject of expert testimony[,]" and limited such testimony to "only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse."

Furthermore, the parties filed their briefs before the Court issued its opinion in State v. G.E.P., 243 N.J. 362, 370 (2020), which accorded pipeline retroactivity to the holding in J.L.G.  Defendant's appeal was pending when G.E.P. was decided, and, therefore, J.L.G.'s holding applies to the issue raised in Point One.  See id. at 386 (defining pipeline retroactivity as applying the rule "in all future cases, the case in which the rule is announced, and any cases still on direct appeal" (quoting State v. Knight, 145 N.J. 233, 249 (1996))).  We must consider whether the CSAAS expert testimony adduced by the State at trial exceeded the now permissible bounds of such evidence, and, if so, whether under the particular facts its admission resulted in harmful error requiring reversal.  Id. at 389–90.

Having carefully considered the record, we conclude the expert CSAAS testimony in this case exceeded the scope now permitted by J.L.G., and its admission "raise[s] a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached."  Id. at 390 (quoting State v. Jordan, 147

4

N.J. 409, 422 (1997)).  We therefore reverse, vacate defendant's conviction and remand for a new trial.

I.

For reasons that are unrelated to the issues on appeal, the trial did not commence until July 2017.  We summarize some of the trial evidence to provide context before turning to the critical CSAAS expert testimony.

A.

The children's mother, A.C. (Ava), worked during the day and in the morning frequently dropped them off at the residence of Alice's father, L.M. (Leon), who lived with his mother and other family members in his mother's home.  Leon would take Alice to school and make sure Eve, who "was classified" and attended "special classes," would board the bus to school.  Defendant is Leon's uncle, and, for a period, lived in the basement of the house and thereafter frequented it.

In April 2010, when Eve was fourteen-years old and Alice was nine, Ava and her husband, P.C. (Paul), took the children to a restaurant following Alice's violin recital.  Alice told her mother that she and Eve had something to tell her and asked Ava to accompany them to the restaurant's restroom.  There, Alice disclosed that defendant "had been touching her in places and making her put

her mouth in places." Eve said that the same things happened to her. Ava and Paul immediately drove with the girls to the local police department and reported the disclosure. Ava testified that while in the car, Eve said defendant had "raped her." The following day investigators from the Passaic County Prosecutor's Office (PCPO) interviewed Ava and both girls.

During her testimony, Ava acknowledged that after the initial disclosures, she never asked either girl to provide any details of the events, "for example, where [the] incidents happened, when it happened, [or] how it happened[.]" The jury viewed a video recording of PCPO Investigator Giselle Henriques's interview of Alice.

Eve was twenty-one-years old when she testified at trial. Although originally providing a statement that the abuse began when she was ten-years old, Eve testified that defendant began touching her breasts and genitals, and rubbing his penis against her genitals, when she was twelve or thirteen-years old. She testified this happened twenty times after school in Leon's mother's home, and, at least on some occasions, when other family members were in the house.

On cross-examination, Eve said Alice was never present when defendant touched her, and she never witnessed any similar incidents between Alice and

defendant. Eve also acknowledged that when Dr. Paulett Diah, the State's expert child abuse pediatrician who examined the children in November 2010, asked what happened, Eve told the doctor, "If you want to know about this[,] talk to my mother."[3] Alice was seventeen-years old when she testified. She said defendant began to touch her when she was four or five-years old, and the abuse continued until she was between six or eight-years old. Alice said defendant rubbed his penis against her genitals and touched her breasts and genitals. On one occasion, while defendant placed his penis on Alice's vagina in the basement of the house, Leon's mother started to come down the stairs, and defendant stopped. After each incident, defendant told her not to tell anyone, especially Leon, and gave her candy or money as a "bribe."

Alice said that she and Eve first discussed the abuse one or two months before the April 2010 restaurant disclosure to their mother. She decided to make the disclosure because Ava was about to marry Paul and move with the children. Leon, however, wanted custody of Alice and her younger sister so they could come live with him. Alice said, "the real reason I . . . told [my mother was] because I didn't want the same thing to happen to my little sister." Alice never

---

[3] Dr. Diah found no physical signs of sexual abuse on either child during her examination, but this, she said, was to be expected given the passage of time between the disclosure, in April, and the examination, in November.

witnessed defendant molest Eve, and she did not believe Eve ever saw defendant molest her.

Defendant produced three family members as witnesses. Both Alice and Eve said all the incidents occurred while defendant resided in Leon's mother's home. The defense witnesses testified that defendant only lived there for approximately twelve months, during 2003-04, before the dates alleged in the indictment. Defendant's niece, Leon's sister, described incidents when Alice would come to the family home for visitation with her father. Alice would not want to leave because of the physical discipline Ava imposed at home. She testified to seeing Ava strike Alice.

## B.

During the State's case, clinical psychologist Dr. Brett Biller testified without objection as an expert in "sexual abuse and [CSAAS]." Dr. Biller explained in detail the "five factors" comprising the theory behind CSAAS.

The first factor, secrecy, is a "necessary part of child sexual abuse." Secrecy is a "source of fear[,]" where the abuser may directly tell the victim in a threatening manner to not tell anyone or promise safety if they keep it a secret. The second factor, helplessness, describes the difference in power between the victim and the abuser, not only physically but within the relationship, for

example, with gift-giving. Third, entrapment accommodation, is the child's sense that he or she cannot say anything out of fear or due to financial implications if the abuse is disclosed. This causes the child to adapt his or her behaviors and think of accepting the abuse. Fourth, delayed disclosure, is a process that happens over time and reflects disorganized and missing information, because the child is "still testing the water." Finally, recantation occurs when the child does not feel supported after his or her disclosure and takes back the report of abuse.

In her summation, the prosecutor referenced Dr. Biller's testimony as "information" the jurors could put "in [their] toolbox" and use during their deliberations. She reminded them of Dr. Biller's discussion of delayed reporting, saying it explained Alice's failure to immediately tell anyone of the abuse, particularly since defendant told the child, "Don't tell anyone." The prosecutor cited the "age differential" between defendant, who was seventy-three-years old at the time of trial, and the two girls, and the "power differential" between them and defendant. The prosecutor suggested the jury should consider the "five factors . . . and . . . sift through the facts here and . . . see if you believe that this girl[,]" referencing Alice, "was sexually abused by her uncle."

C.

After J.L.G., Dr. Biller's testimony clearly exceeded the bounds of permissible CSAAS opinion testimony and, to the extent the State argues otherwise, the contention lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).[4] The only close question on appeal is whether the now inadmissible CSAAS testimony was plain error. See G.E.P., 243 N.J. at 389 (noting "[p]lain errors are those 'clearly capable of producing an unjust result.'" (quoting R. 2:10-2)). In order to properly answer the question, "[t]he error[s] must be evaluated 'in light of the overall strength of the State's case.'" State v. Prall, 231 N.J. 567, 588 (2018) (alterations in original) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). Indeed, the Court has repeatedly engaged in such an evaluation in cases involving CSAAS testimony.

In State v. J.R., a case that predated J.L.G., the Court concluded the CSAAS expert testimony "exceeded the parameters imposed" by prior precedent. 227 N.J. 393, 417 (2017). However, the Court considered the other trial evidence, including the victim's testimony, the testimony of "four family members" that was consistent with the victim's account, and

---

[4] As already noted, because the briefs were filed before the Court decided G.E.P., we need not address the State's separate argument that J.L.G. should not be applied retroactively to this appeal.

defendant's "self-incriminating comments[.]" Id. at 419–20. The court concluded the expert's "brief venture beyond the bounds of proper CSAAS testimony [did not] change[] the result of defendant's trial." Id. at 420.

Similarly, in J.L.G. and in each of the four consolidated cases in G.E.P., the Court evaluated whether the inadmissible CSAAS testimony was harmful error in light of the strength of the State's evidence. In J.L.G., the Court concluded that the admissibility of CSAAS delayed disclosure testimony, like other expert testimony, "is not appropriate to explain what a jury can understand by itself." 234 N.J. at 305 (citing State v. Cain, 224 N.J. 410, 427 (2016)). "Whether a victim's delayed disclosure is beyond the ken of the average juror will depend on the facts of the case." Ibid. Thus, if a child victim offers no "rational explanation for the delay in disclosing abuse[,]" expert testimony may be appropriate; conversely, the victim's "explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony." Ibid. The Court concluded that because the victim "gave sound reasons for the delay" during her testimony, even the permissible CSAAS testimony regarding delayed disclosure was "not called for to 'assist the trier of fact.'" Ibid. (citing N.J.R.E. 702).

The Court, however, found the admission of CSAAS expert testimony was "harmless in light of the overwhelming evidence of [the] defendant's guilt." Id. at 306. That evidence included the victim's detailed testimony, an audio recording she made of one of the sexual assaults, including defendant's "[e]xplicit and disturbing language" that confirmed the victim's account, phone conversations law enforcement monitored between the victim and the defendant in which "he offered her money and other items after asking her to retract her accusations[,]" and eyewitness testimony from a friend of the victim's mother who witnessed the defendant in an aroused state "lying on top of the victim[.]" Ibid. The Court concluded "admission of the CSAAS evidence . . . was harmless." Id. at 307.

In G.E.P., the Court reviewed the evidence in each of the four consolidated cases and affirmed only G.E.P.'s conviction. 243 N.J. at 393. There, in addition to the victim's testimony, the State introduced a recorded phone call between the victim and G.E.P. providing "damning, compelling evidence of guilt[,]" and a bag of straps, rubber bands and clothespins seized from the defendant's office that corroborated the victim's testimony of sexual abuse. Id. at 390.

However, the Court agreed that we properly reversed the convictions of the other three defendants, R.P., C.P., and C.K., because the evidence in each of

12

those cases was based largely on the testimony of the alleged victims, and in two cases, "witnesses that repeated [the victims'] allegations." Id. at 392. In those cases, "CSAAS testimony bolstering the alleged victims' testimony was 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached,' and therefore was clearly capable of producing an unjust result[.]" Ibid. (quoting Jordan, 147 N.J. at 422).

The evidence presented in this case closely resembles the evidence presented by the State in R.P., C.P., and C.K. Eve and Alice testified, but both admitted never witnessing any sexual incidents defendant allegedly performed on the other. To some extent, they corroborated the circumstances of the disclosure they made to their mother, but Ava testified that neither supplied her with any details. The only other evidence was Ava's testimony about the girls' disclosure and the video interview of Alice.

Dr. Biller, however, testified in detail about the five factors that comprise the theory of CSAAS. In her summation, the prosecutor highlighted two of those factors in urging the jurors to find Alice and Eve credible, only one of which — delayed disclosure — is now permissible expert testimony. As noted, the jury found defendant guilty of only one of the eight counts, third-degree endangering, which alleged that defendant had "engage[d] in sexual conduct that would impair

or debauch the morals of [Alice]." Even though the jury could not reach a verdict on some of the counts, and clearly rejected the State's evidence on others, the admission of improper CSAAS testimony in this case had the capacity to lead the jury to a result it otherwise would not have reached on the child endangering count.

We therefore reverse defendant's conviction and remand to the Law Division for a new trial.

II.

For the sake of completeness, we address the argument raised by defendant in Point Two.

During cross-examination, defense counsel repeatedly asked Alice about accepting money from defendant, and, whether she and Eve used the money to buy snacks. The following colloquy occurred:

> Alice: Are you going to keep asking —
>
>     . . . .
>
> — the same question? Does that make the matter any
> better?
>
> Defense Counsel: Judge, please?
>
> Alice: Accepting money to —
>
> The Court: Okay, —

Alice:  No.

. . . .

The Court:  All right.  Ladies and gentlemen, if you can just go in the room, please?  Just for a few seconds.

The transcript reflects the jury exited the courtroom, but Alice continued:

Alice:  Doesn't make it okay.  Just because you accept something, —

. . . .

— doesn't make it okay.

. . . .

The Court:  When I ask you to say stop, you're going to stop.

Alice:  I'm not, sorry.  Not today.  It doesn't make it okay.  I don't see the point (indiscernible).

Defendant moved for a mistrial.  The judge denied defendant's motion, noting he had quickly excused the jurors before they were able to hear Alice's full statement, and it was not uncommon for the witness to get frustrated during cross-examination, especially considering Alice's age.  The judge concluded, "I do not find anything that this witness said would . . . rise to the level of such an egregious outburst that would taint the entire trial . . . .  [P]roper relief . . . would be a curative instruction[.]"

A-3084-18T1

When the jury returned to the courtroom, the judge said:

> As you were proceeding, . . . I believe there were one or two jurors who were still by . . . the jury room door, and [Alice] continued with her statement. Because I had asked you to leave, some of you were in there . . . maybe one or two were still by the door. That statement is not part of the record because at that point we have determined that I needed to address an issue. So I'm going to ask you that statement that you may have heard shouldn't play no [sic] role whatsoever in your determination or deliberation. Because that was not part of the record when that occurred, and as such, I'm going to ask you that should play no role whatsoever in your deliberations.

Defendant contends the judge erred by denying his motion for a mistrial without first questioning the individual jurors whether they heard Alice's outburst and whether it affected their continued ability to decide the case. He also argues the judge's curative instruction was insufficient to cure any taint. We disagree.

"Trials are not perfectly orchestrated productions." State v. Yough, 208 N.J. 385, 388 (2011). The grant of a mistrial is an extraordinary remedy to be exercised only when necessary to "prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997) (citing State v. Rechtschaffer, 70 N.J. 395, 406 (1976)). We will not reverse a trial court's denial of a mistrial motion absent a "clear showing" that "the defendant suffered actual harm[,]" or that the court

otherwise "abused its discretion[,]" resulting in "manifest injustice[.]" State v. LaBrutto, 114 N.J. 187, 207 (1989). "[W]hether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'" Yough, 208 N.J. at 397 (quoting State v. Winter, 96 N.J. 640, 646–47 (1984)).

Here, the judge reacted quickly, excusing the jurors. According to the judge, most of the jurors were already in the jury room as Alice completed her outburst. The judge's curative instruction should have said more than simply telling the jurors that Alice's comments were "not part of the record[.]" In addition to telling the jurors as he properly did that the outburst "should play no role whatsoever in [their] deliberations," the judge should have made it clear that the statements were argumentative and improper. However, any shortcoming in this regard did not amount to reversible error. See State v. Vallejo, 198 N.J. 122, 139 (2009) ("The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." (citing Winter, 96 N.J. at 647)).

Reversed. We vacate defendant's conviction and remand the matter for a new trial. In light of our decision, we need not address defendant's sentencing arguments.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3084-18T1