**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2626-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANDY R. TORRES, a/k/a
ANDREW R. TORRES, and
ANDREW RUBIN TORRES,

     Defendant-Appellant.

_____

> Argued January 30, 2019 – Decided March 4, 2019
>
> Before Judges Koblitz, Ostrer and Currier.
>
> On appeal from Superior Court of New Jersey, Law Division, Warren County, Indictment No. 13-02-0051.
>
> Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Lauren S. Michaels, of counsel and on the brief).
>
> Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the brief).

PER CURIAM

Defendant Andy R. Torres appeals from his convictions after trial of second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1(a)(1); first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(c). During the jury trial, the court dismissed a charge of third-degree tampering with a witness, his girlfriend Alexis,[1] N.J.S.A. 2C:28-5(a)(1), and defendant was acquitted of first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2). After the jury trial, he was convicted by the court of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1). Defendant was sentenced to an aggregate term of forty-years imprisonment, with eighty-five percent parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We reject defendant's claims of reversible trial errors and affirm the convictions, but remand for resentencing.

Testimony at trial revealed the following. Several people heard a gunshot at a BP gas station in Phillipsburg around midnight on January 5, 2012. Two

---

[1] We use first names when referring to Alexis and her brother, Zach, to avoid confusion and preserve their anonymity.

witnesses described "two white guys" running from the gas station wearing similar jackets.

Lieutenant Ralph Reppert of the Phillipsburg Police Department arrived at the gas station, where he saw the attendant, lying in a pool of blood, shot once through the thigh. He noticed a shotgun-style ammunition "wad" laying on the ground near the attendant's booth. The attendant had a significant injury to his right thigh, suffering damage to major blood vessels. He died on January 7, 2012.

On January 11, 2012, the police located defendant and Alexis in a friend's home in Pennsylvania. The friend testified that defendant and Alexis were staying with her before the incident occurred. When the police arrived, she told them about defendant's shotgun and led them to the kitchen closet where it was located. She said that when she saw defendant put it there, she told "him to get that out of my house, I didn't want that in my house." It was loaded with two shells. Later testing revealed that it was functional. Defendant did not have a firearms purchaser identification card. Co-defendant David Beagell was taken into custody on January 25, 2012.

After receiving information from the victim's family, an officer went to pawn shops in Allentown looking for a twenty-two-carat gold wedding ring that

belonged to the victim.  The police found the victim's ring at a pawn shop a five-minute walk from the home where defendant was staying.  The pawn shop owner testified that defendant pawned a ring on January 9, 2012.  The transaction required defendant to show a photo identification and provide a signature, which defendant did in his own name.

After defendant was arrested, he waived his Miranda[2] rights and gave a statement regarding his involvement in the robbery and shooting.  Defendant's statement was recorded, and the DVD of his statement was admitted into evidence and played for the jury.

In his statement, defendant said he gave his shotgun to Beagell.  When they got into New Jersey, Beagell and Alexis's brother Zach stole a New Jersey license plate and put it on the car so that no one would know that they were from Pennsylvania.  Defendant gave Beagell the shotgun and three shells; the shotgun was not loaded when defendant gave it to Beagell.  The two men went behind the BP gas station while defendant and Alexis sat in the car.

Alexis later drove up to the gas station and asked the gas attendant for directions.  Beagell and Zach came up from behind the attendant and Beagell

---

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-2626-15T2

put the shotgun up to his head and demanded money. The shotgun "literally touched the freaking guy's head." Defendant was scared it was going to go off, so he told Alexis to "get the fuck outta here." Alexis looked scared, but she drove off.

Defendant and Alexis drove around and saw Beagell and Zach in the parking lot of another station and picked them up. Then they drove back to Pennsylvania, where they divided the money from the robbery.

Defendant denied that he shot the gas station attendant. He claimed that he did not even know that the attendant had been shot until the next day when Beagell's girlfriend showed him a news article on her cell phone. He did not know where his shotgun was, but thought Beagell still had it, and he denied that the shotgun found was his. He also claimed he did not know anything about the attendant's missing ring.

The State then called Alexis, who took the stand and testified that defendant was her boyfriend. They were living together in January of 2012. She started testifying about being at her mother's house with defendant on January 4, 2012, but then refused to testify further stating: "Listen, I can't do this. I can't. I don't want to. Take it back."

At sidebar, the court and counsel had an extensive discussion on how to proceed. Ultimately, the court decided to adjourn Alexis's testimony to allow her an opportunity to consult with counsel.

The next day, the court advised Alexis of the consequences of her continued refusal to testify. When she was subsequently questioned by counsel, Alexis stated: "I don't want to testify," and "I don't want my plea." When asked by the court what she meant, Alexis stated, "I don't want to cooperate with the State." Alexis also stated that she made the decision not to testify on her own after speaking with counsel, and that her decision was not "influenced in any way by any threat or promise or inducement by any person, [defendant], or anybody else."

The court advised the prosecution to call the State's next witness "without further comment or without any comment to the jury as to what we've been doing this morning other than resolving legal issues." Defense counsel did not object or request any curative instruction.

Beagell testified for the State as part of a plea deal; the murder and felony murder charges against him were dismissed in exchange for his testimony against defendant. He had jumped out of a third-floor window of the house

6

when the police came and arrested defendant and Alexis on January 11, 2012. Beagell was not arrested until January 25, 2012.

Beagell testified to the following. On the evening of January 4, 2012, Beagell was in his room drinking alcohol and smoking marijuana when Zach said that defendant and Alexis wanted to rob a house or a gas station. Defendant said he needed to pick up his shotgun and some clothes.

They then drove to the BP gas station in Phillipsburg and parked across the street. Alexis drove over to the gas station and asked the attendant for directions. While she was talking to the attendant, defendant and Zach "came up on the guy" from behind. Defendant pointed the shotgun at the attendant's head. Beagell "bugged out" and told Alexis "to hit the gas and go." Alexis drove off.

Defendant had the shotgun when he returned to the car. He took the shell out of the shotgun and said: "I shot the mother fucker." Defendant said something like: "I just shot him in his leg. It's going to be all right." Beagell also noticed that "[defendant] had a ring on his hand," which defendant said he took from the gas station attendant.

After the State rested, defendant moved for a judgment of acquittal on the witness tampering charge, as well as a mistrial. The State did not object to the

dismissal of the witness tampering charge and the court entered a judgment of acquittal, but denied the motion for a mistrial.

Defendant testified in his defense that he was not involved in the planning of the robbery, and did not travel to the BP gas station with Beagell, Zach and Alexis. He claimed that he first learned of the robbery later that afternoon when he went looking for Alexis. Zach and Beagell "were both arguing amongst themselves, really loud, violently, about blaming each other for shooting the man."

The following Sunday, Alexis and Zach's mother:

> pulled me into another room with Alexis and starting [sic] speaking to me, asking me for my assistance, because she felt that if things were to arise to a point with the police involvement that [Beagell] would blame her son, [Zach,] so she asked me to help . . . . And she told me pretty much what I was to say in order to make sure that Zach wouldn't be in trouble.

She told defendant to tell the police that he was present during the robbery and had witnessed Beagell with the shotgun.

Defendant testified that he had lied to the police. The statement he gave implicating himself in the crimes was false. He said he could not remember "a lot of things" because he was "extremely high at the time." He admitted that the

shotgun in evidence was his, but claimed that it belonged to both him and Zach, and he did not know if it was used in the robbery.

He said he did not actually know who shot the victim, but he believed at the time that Beagell "was the type of guy" who would have done so. "He came across as that type of person." He admitted pawning a ring for $81, but claimed he did not know whether the ring in evidence was the ring he had pawned. Alexis had given him "a bunch of jewelry that week" to pawn.

Defendant raises the following issues on appeal:

> POINT I: THE COURT ABUSED ITS DISCRETION IN DENYING TORRES' MOTION TO SEVER THE WITNESS-TAMPERING CHARGE, EMPLOYING THE WRONG TEST AND FAILING TO APPLY AN N.J.R.E. 404(B) ANALYSIS. THEN, ONCE HIS CO-DEFENDANT/GIRLFRIEND REFUSED TO TESTIFY, AND THE TAMPERING CHARGE WAS DISMISSED, THE COURT WAS REQUIRED TO DECLARE THE REQUESTED MISTRIAL. ALTERNATIVELY, THE JUDGE'S FAILURE TO INSTRUCT THE JURY REGARDING HOW, IF AT ALL, IT COULD CONSIDER ALEXIS'S TESTIMONY AND BREAKDOWN, AND THE DISMISSED CHARGE, IN ITS CONSIDERATION OF THE REMAINING CHARGES WAS PLAIN ERROR.
>
> A. THE DENIAL OF THE TAMPERING CHARGE DEPRIVED TORRES OF A FAIR TRIAL.
>
> B. ONCE THE TAMPERING CHARGE WAS DISMISSED, THE COURT WAS OBLIGATED TO

DECLARE A MISTRIAL; THE FAILURE TO DO SO DENIED TORRES A FAIR TRIAL.

C. THE FAILURE TO PROVIDE THE JURY ANY GUIDANCE ABOUT ALEXIS' EMOTIONAL BREAKDOWN AND HER TESTIMONY WAS PLAIN ERROR THAT DENIED TORRES A FAIR TRIAL.

POINT II: TORRES' TRIAL WAS INFECTED WITH IMPROPER OTHER-CRIMES EVIDENCE INCLUDING THAT DEFENDANT: WAS ON PROBATION AT THE TIME OF THE OFFENSE; HAD PREVIOUSLY COMMITTED A BAD ACT INVOLVING SOMEONE'S DAUGHTER WHO HAD BEEN LEFT AT HOME; AND HAD CHOKED HIS CO-DEFENDANT GIRLFRIEND, WHO WAS A STATE WITNESS.

POINT III: THE COURT'S REFUSAL TO HAVE THE CO-DEFENDANT/GIRLFRIEND, WITH WHOM THE STATE ALLEGED DEFENDANT HAD TAMPERED AS A WITNESS, TESTIFY IN CIVILIAN CLOTHES VIOLATED THE SUPREME COURT'S MANDATE IN STATE v. KUCHERA.

POINT IV: THE PROSECUTOR COMMITTED PROSECUTORIAL MISCONDUCT AND VIOLATED TORRES' RIGHT TO CONFRONTATION BY REFERRING IN HIS OPENING STATEMENT TO THE EXISTENCE OF A NON-TESTIFYING ANONYMOUS INFORMANT WHO ALLEGEDLY IMPLICATED TORRES.

POINT V: THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED TORRES A FAIR TRIAL.

POINT VI: A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE JUDGE ERRED IN FINDING AND WEIGHING AGGRAVATING AND MITIGATING FACTORS, AND IMPOSED DUPLICATE MONETARY PENALTIES.

I.

In point I of his brief, defendant contends that the trial court erred in its handling of the witness tampering charge by denying his motion to sever the witness tampering charge, denying his request for a mistrial after the tampering charge was dismissed, and failing "to provide the jury any guidance about Alexis' emotional breakdown and her testimony."

A.    Motion to Sever

Defendant argues that the trial court did not conduct the proper analysis under N.J.R.E. 404(b) before denying his severance motion. According to defendant, "[t]he tampering charge fails both the third and fourth prongs" of the test established in State v. Cofield, 127 N.J. 328, 338 (1992).

Any error in failing to sever was harmless because no evidence of witness tampering was presented to the jury, and the claim was ultimately dismissed. While defendant argues that he was prejudiced by the prosecutor's reference to Alexis's anticipated testimony in his opening statement, the prosecutor's remarks are not evidence to be considered by the jury, and the jury was so instructed.

The jury is presumed to have understood and followed that instruction. State v. Feaster, 156 N.J. 1, 65 (1998); see also State v. T.J.M., 220 N.J. 220, 237 (2015) (appellate courts "act on the belief and expectation that jurors will follow the instructions given them by the court").

## B.    Motion for Mistrial

Next, defendant contends that the court erred by failing to grant a mistrial after Alexis refused to testify and the witness tampering charge was dismissed. He argues that "[t]he allegation that [he] tampered with Alexis as a witness infected the entire trial." First, he claims he was prejudiced by the prosecutor's reference to Alexis's anticipated testimony in his opening statement. Second, "Alexis's display in front of the jury, and the tampering accusations that hung over the entire trial, dismissal notwithstanding, denied him the opportunity to have the jury fairly evaluate [his] viable defense." According to him, "if [he] could have presented his defense without the implication that he had threatened or otherwise tampered with Alexis, there is a reasonable probability that they would have believed this testimony, or concluded that a reasonable doubt existed."

"A mistrial is an extraordinary remedy" that should be employed "[o]nly when there has been an obvious failure of justice . . . ." State v. Mance, 300 N.J.

Super. 37, 57 (App. Div. 1997). "Whether manifest necessity mandates the grant of a mistrial depends on the specific facts of the case and the sound discretion of the court." State v. Allah, 170 N.J. 269, 280 (2002). When "the court has an appropriate alternative course of action" it should deny the request. Id. at 281. The decision to grant or deny a mistrial is within the trial court's "sound discretion" and "will not be reversed absent a clear showing of prejudice to defendant." State v. Provoid, 110 N.J. Super. 547, 558 (App. Div. 1970).

During his opening statement, the prosecutor said: "Now the charges, as you heard, also include witness tampering, and you're going to hear testimony from Alexis . . . that after this [the robbery and shooting] happened [defendant] went reaching out to her, asking her to change her testimony and change her statement, and that ladies and gentlemen, establishes witness tampering."

A prosecutor may state in his opening facts he intends in good faith to prove by competent evidence, and the "[f]ailure of proof to meet expectations is not cause for reversal 'unless allegations . . . are completely unsupported by the evidence and there is a showing of prejudice to the defendant and bad faith by the prosecutor.'" State v. McAllister, 41 N.J. 342, 351 (1964) (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960)); see also State v. Burns, 192 N.J. 312, 333-34 (2006) (in determining whether a witness's refusal to testify at trial unduly

prejudiced a criminal defendant, a reviewing court should consider whether there was any misconduct or improper motive in prosecutor's decision to call witness).

Here, the court correctly pointed out that the prosecutor acted in good faith by commenting on the expected testimony of Alexis in his opening statement and by calling her to the stand. Alexis's failure to testify as expected was through no fault of the State, and the prosecutor reasonably expected Alexis to honor the terms of her plea agreement. Additionally, the court properly determined that any alleged prejudice from the prosecutor's opening remarks would be sufficiently remedied by a curative instruction reminding the jury that the prosecutor's remarks are not evidence to be considered by them in their deliberations.

### C. Failure to Provide, Sua Sponte, an Additional Instruction

Finally, defendant argues for the first time on appeal that the court's failure to provide the jury any guidance about Alexis's "emotional breakdown and her testimony" was plain error.

During the charge conference, defense counsel requested that the court instruct the jury that the witness tampering charge "is no longer available for

their consideration" and that "defendant has, in fact, been acquitted of witness tampering." In doing so, he argued:

> I think in the context of this case, with the appearance of [Alexis] and her partial testimony and the State's opening to the effect that the defendant, at least by the State's theory, had done something to dissuade [Alexis] from testifying, the only way to undo -- I'm not sure it does undo it totally -- but the only way to begin to undo that prejudice is to tell the jury that the [c]ourt has acquitted [defendant] of [witness tampering].

The court agreed and told the jury: "Now, the fact that I have entered a judgment of acquittal, in other words, found Mr. Torres not guilty of that charge as a matter of law, should not influence you or become a part of your discussion or decision making on the balance of the charges."

Because defendant did not object below, this issue is reviewed for plain error, and reversal is unwarranted unless the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Plain error in the context of a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). No further instruction was needed here.

15

II.

In point II of his brief, defendant contends that the court erred by denying his mistrial requests related to the improper admission of other bad-acts evidence. He argues that evidence "had no legitimate purpose and served only to suggest that [he] had a propensity for criminality and violence."

### A. Reference to Defendant's Probation

Detective Cruz testified about his involvement in the investigation. Cruz volunteered: "Well, Mr. Torres had an outstanding probation[.]"

Defense counsel immediately requested a mistrial. The prosecutor represented to the court that he had advised Cruz that he should not mention any outstanding warrants. The court found Cruz's mention of probation was an "innocent error." The court ruled that a mistrial was not necessary and that a curative instruction was sufficient to alleviate the alleged prejudice. Defense counsel "strongly" objected to any such instruction, arguing that it would only "enhance the testimony."

"[A] trial is not a perfectly scripted and choreographed theatrical presentation; rather, it is an extemporaneous production whose course is often unpredictable given the vagaries of the human condition." State v. Yough, 208 N.J. 385, 397 (2011). "Attorneys will sometimes pose inartfully crafted

A-2626-15T2

questions, and even the most precise question may bring an unexpected response from a witness." Ibid. A mistrial should only be granted "to prevent an obvious failure of justice," and the decision to grant a mistrial is entrusted to the "sound discretion of the trial court." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "[A]n appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." Harvey, 151 N.J. at 205.

We do not find reversible error regarding the comment made by Detective Cruz. The trial court had the "feel of the case" and was in the best position "to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Winter, 96 N.J. 640, 646-47 (1984).

### B.    Redaction Mistake

In part of his statement to police, defendant said:

> I give the fucking gun to Dave, cause he's showed me guns that he's had before. He had a fucking .357 snub nose, the only reason I know that is because he fucking gave me every detail about it, it was chrome or black (INAUDIBLE) . . . he had a .45, like I don't fuck with guns, I don't like guns. I like to fight. I gave him the gun. We left. We went back to Michelle's house for a little bit, hung out. Everyone smoked, calmed down or whatever. I didn't wanna go at first, I really didn't. I don't like breaking into people's houses, because I used to do that when I was young and I was living in Las Vegas.

[Detective]: M-hm.

[Defendant]: <u>And when I did that, the people left their daughter home and ever since then I refused to do that shit</u>. We go to fucking Jersey. Me and my fucking girlfriend are sitting in this fucking car. I'm telling her, yo, let's just fucking leave. If they wanna fucking sit here, let 'em sit here. The gun's not under my name. It's fucking illegal. If they get caught they get caught. She's like no, that's my little brother. And I understand that.

[(emphasis added).]

The court ruled that the two emphasized sections would be redacted. When defendant's statement was played for the jury, however, only the first emphasized portion was redacted. The second portion, "and when I did that, the people left their daughter home and ever since then I refused to do that shit," was inadvertently left in and heard by the jury. Defense counsel immediately moved for a mistrial. In denying defendant's application, the court explained that the second statement standing alone "makes no sense" and thus, although mistakenly left in by the State, is not a mistake "of sufficient magnitude" to result in a mistrial. The court did not abuse its discretion by failing to declare a mistrial under these circumstances.

    C.    <u>The Prosecutor's Cross-Examination of Defendant</u>

18

During his direct testimony, defendant said that he lied to police about his involvement in the armed robbery because he "loved Alexis." On cross-examination, the prosecutor asked, "You loved Alexis so much you tried to choke her, right, right after this happened?" and defendant answered, "No." Defense counsel immediately objected, stating "that's false," and that "it should never have been introduced into this case." At sidebar, defendant requested a mistrial, arguing that the question was "totally improper."

The prosecutor responded that, during his statement to the police, defendant said, "I just fought with my girlfriend. Okay. I literally just put my hands on her. I didn't punch her or anything, but I did grip her up." The court sustained the objection, but denied a mistrial, advising counsel that it would tell the jury that defendant's objection was sustained. It then instructed the jury that the objection was sustained.

The court then told the prosecutor that he could proceed with the cross-examination, but requested that he "rephrase the question." Defendant explained that he did put his hands on Alexis, but "[n]ot in the manner you're speaking." He said he put his hands "on her shoulders" and "gripped them . . . [h]ard enough to grab her attention."

A-2626-15T2

"If [a criminal defendant] takes the stand and testifies in his own defense his credibility may be impeached and his testimony assailed like that of any other witness . . . ."  Brown v. United States, 356 U.S. 148, 154–56 (1958) (quoting Fitzpatrick v. United States, 178 U.S. 304, 315 (1900)).

Defendant had the opportunity to explain fully what happened and was not unduly prejudiced by the question on cross-examination.  Defendant denied that he choked Alexis, and the court sustained defense counsel's objection to the prosecutor's original question.  The trial court did not err in denying defendant's motion for mistrial.  See State v. LaBrutto, 114 N.J. 187, 207 (1989) ("motions for mistrial based on misconduct should be granted only where manifest injustice would otherwise result"); see also State v. Ribalta, 277 N.J. Super. 277, 291 (App. Div. 1994) ("A mistrial is an extraordinary remedy and should be resorted to only to prevent an obvious failure of justice.").

### III.

In point III of his brief, defendant contends the court erred by permitting Alexis, a State witness, to testify in prison garb. Prior to Alexis taking the stand, the court informed counsel that she was wearing prison garb.  Defense counsel objected and requested that she be permitted to testify in civilian clothes, arguing "her appearance in prison garb might engender sympathy for her."

The court did commit error by permitting Alexis to testify in prison garb, but not reversible error. Our Supreme Court has held that to preserve a criminal defendant's constitutionally protected right to a fair trial, "a trial court may not require a defendant's witness to appear at trial in prison garb." State v. Artwell, 177 N.J. 526, 533, 539 (2003) (referring to U.S. Const. amends. V, VI, and XIV; N.J. Const. art. I, ¶ 10)).

In State v. Kuchera, 198 N.J. 482, 485-86 (2009) our Supreme Court determined that witnesses for both parties should not testify in prison garb. The Kuchera Court, however, acknowledged that there may be exceptions to that general rule:

> Finally, whether a witness testifies wearing prison garb will be subject to review under the abuse of discretion standard and will be gauged as whether it constitutes harmless error, that is, whether the error "'is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Castagna, 187 N.J. 293, 312 (2006) (quoting R. 2:10-2; editing marks omitted).
>
> [Id. at 501.]

Here, the court misapplied its discretion by, without explanation, denying defense counsel's request that Alexis appear wearing civilian clothes, deviating from the general rule that such witnesses appear in civilian clothes. See id. at 500-01; see also Artwell, 177 N.J. at 539. The court also erred by failing to

21

instruct the jury that Alexis's appearing in prison garb should play no role in weighing the evidence and determining defendant's guilt. See Kuchera, 198 N.J. at 501.

However, both errors were harmless beyond a reasonable doubt. See R. 2:10-2; see also Kuchera, 198 N.J. at 501; Castagna, 187 N.J. at 312. Defendant was not prejudiced because the witness tampering charge was dismissed and Alexis did not provide any inculpatory testimony against defendant.

IV.

In point IV of his brief, defendant contends he was entitled to a mistrial because the prosecutor's opening statement improperly stated that law enforcement received an anonymous tip that implicated him in the robbery and homicide. He argues the prosecutor committed prosecutorial misconduct and violated his Sixth Amendment right to confrontation by referring to the existence of a non-testifying anonymous informant who allegedly implicated him in the crimes.

During his opening statement, the prosecutor said:

> So now an investigation begins, right? I mean you have
> a body, they know that the individual, you can tell by
> the wound that the individual was shot with a shotgun,
> and we put out a flyer, we start asking around, and it
> was some time, a few days, before we got a break in the
> case, when an anonymous tip came in about some

22

individuals who they believed were involved in this crime. And law enforcement followed up on that anonymous tip, and it led us to Zach, Alexis . . . , Dave Beagell[.]

The court denied defense counsel's application for a mistrial, determining that "extreme remedy" was "not necessary or appropriate under these circumstances."

Defense counsel requested that the court not advise the jury of his objection "because that's only going to ring the bell a bit harder." As a result, the court instructed the jury as follows: "Ladies and gentlemen you are reminded that what the attorneys say in their opening statements is not evidence. The evidence will come from the witnesses and the documents and other physical items which may be introduced for your consideration."

In considering the issue of prosecutorial misconduct, we must first determine whether misconduct occurred. State v. Frost, 158 N.J. 76, 83 (1999). Where such misconduct is identified, reversal is not warranted unless the misconduct is so egregious that it deprived the defendant of a fair trial. State v. Timmendequas, 161 N.J. 515, 575 (1999).

During an opening statement, the prosecutor is permitted to refer to the facts he or she intends in good faith to prove by competent evidence. State v. Wakefield, 190 N.J. 397, 442 (2007). A prosecutor is given great leeway and is

allowed to be forceful.  State v. Pindale, 249 N.J. Super. 266, 285 (App. Div. 1991).

Defendant argues that the prosecutor's opening statement violated his Sixth Amendment right to confrontation.  "A defendant's right to confront and effectively cross-examine the State's witnesses is essential to the due process right to a 'fair opportunity to defend against the State's accusations,' and is one of 'the minimum essentials of a fair trial.'"  State v. Gilchrist, 381 N.J. Super. 138, 144 (App. Div. 2005) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)).

> It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so "upon information received." [McCormick on Evidence (2d ed. 1972), § 248, p. 587]. Such testimony has been held to be admissible to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct.  However, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony violates the hearsay rule. Moreover, the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him.
>
> [State v. Bankston, 63 N.J. 263, 268 (1973) (citations omitted).]

A specific hearsay statement is not required in order to create an impermissible inference of guilt. State v. Irving, 114 N.J. 427, 446 (1989); State v. Torres, 313 N.J. Super. 129, 157 (App. Div. 1998). "When the logical implication to be drawn from [a witness's] testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Bankston, 63 N.J. at 271; see also Branch, 182 N.J. at 352 (phrase "based on information received" may be used by police officers to explain their actions, but only if necessary to rebut a suggestion that they acted arbitrarily and where use of that phrase does not create an inference that defendant was implicated in a crime by some unknown person); State v. Dehart, 430 N.J. Super. 108, 110-11 (2013) (holding it was plain error for a police officer to provide hearsay testimony explaining why he included defendant's photograph in a photo array and for the prosecutor to highlight that testimony in summation). It is the creation of the inference, not the specificity of the statements made, that determines whether the hearsay rule was violated. Irving, 114 N.J. at 447. Nevertheless, the erroneous admission of such testimony is not automatic grounds for reversal, and it may be assessed under the harmless error standard. Bankston, 63 N.J. at 272-73.

"The principle distilled from <u>Bankston</u> and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights." <u>State v. Farthing</u>, 331 N.J. Super. 58, 75 (App. Div. 2000); <u>see also</u> <u>Bankston</u>, 63 N.J. at 265, 268 (holding detective violated hearsay rule by testifying that he received information from an informant that an individual had narcotics in his possession, and then went to a tavern where he saw and arrested the defendant who fit the informant's description); <u>State v. Taylor</u>, 350 N.J. Super. 20, 34-35 (App. Div. 2002) (holding that the police officer's statements about what various unidentified eyewitnesses told the police about the suspect were inadmissible hearsay because they were offered to elicit accusations against the defendant by non-testifying witnesses); <u>State v. Thomas</u>, 168 N.J. Super. 10, 13-15 (App. Div. 1979) (reversing defendant's conviction where prosecutor elicited testimony from detective which led to "inescapable inference" that informant had given him the defendant's name, leading the jury to believe that the unidentified informant told the detective that the defendant committed a crime).

Defendant's reliance on <u>Bankston</u>, <u>Branch</u>, and <u>Dehart</u> is misplaced as all three are distinguishable on their facts. Unlike in <u>Bankston</u>, <u>Branch</u>, and <u>Dehart</u>,

defendant is not challenging the admission of hearsay testimony, but rather, is complaining about the prosecutor's opening statement. At trial, an officer testified only that law enforcement received additional information that led to Pennsylvania, where they sought to speak with defendant, Alexis, and Zach. The jury was repeatedly told that the prosecutor's opening statement is not evidence. The jury is presumed to have understood and followed that instruction. Feaster, 156 N.J. at 65; T.J.M., 220 N.J. at 237.

The decision to grant a mistrial rests within the sound discretion of the trial court. State v. Harris, 181 N.J. 391, 518 (2004). We defer "unless there [was] a clear showing of mistaken use of discretion by the trial court," Greenberg v. Stanley, 30 N.J. 485, 503 (1959), or unless "manifest injustice would . . . result." LaBrutto, 114 N.J. at 207. The prosecutor's remarks were not evidentiary, and the jury was so instructed. See T.J.M., 220 N.J. at 237; Feaster, 156 N.J. at 65. A mistrial was not required after the prosecutor's opening statement.

V.

In point V of his brief, defendant argues that even if none of the individual errors cited in points I through IV above warrant reversal standing alone, the

27

cumulative effect of the cited errors warrants reversal and the granting of a new trial.

"[A] defendant is entitled to a fair trial but not a perfect one." State v. Marshall, 123 N.J. 1, 169-70 (1991). It is well recognized that "incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may [not] be invoked to upset an otherwise valid" verdict. State v. Orecchio, 16 N.J. 125, 129 (1954). The cumulative error doctrine requires the granting of a new trial before an impartial jury when legal errors are either of such a magnitude that defendant has been prejudiced or have in the aggregate rendered the trial unfair. Ibid.; see also State v. Reddish, 181 N.J. 553, 615 (2004) ("[A]lthough an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal.").

When a defendant raises a claim of cumulative error, the court must assess whether the defendant received a fair trial by considering "the impact of the trial errors on defendant's ability fairly to present a defense, and not just excuse error because of the strength of the State's case." State v. Jenewicz, 193 N.J. 440, 473 (2008).

The officer's reference to the fact that defendant was on probation was improper and could have prejudiced his defense. However, the reference to probation was fleeting and unprovoked by the prosecutor. The prosecutor's opening statement reference to an anonymous tip was also not proper. These errors were not significant to the outcome of the trial.

Additionally, allowing Alexis to testify in prison garb and failing to provide a curative jury instruction regarding her appearance was error, but that error did not prejudice defendant because the witness tampering charge was dismissed and Alexis did not provide any inculpatory evidence against him on the other charges. These errors in combination did not deprive defendant of a fair trial.

## VI.

In point VI of his brief, defendant contends the court erred by imposing an excessive sentence. He argues that because the court erred "in finding and weighing aggravating and mitigating factors, particularly in finding aggravating factor one, a remand for resentencing is required." Additionally, the State concedes, a "remand is also required because despite only three offenses remaining after merger, the court mistakenly imposed four sets of monetary penalties."

A-2626-15T2

The court sentenced defendant to a forty-year term of imprisonment under NERA on the felony murder conviction, after merging the conspiracy, possession of a weapon for an unlawful purpose and robbery into the felony murder conviction; a concurrent four-year term on the unlawful possession of a weapon; and a concurrent seven-year term on the certain persons not to have a weapon charge.[3]

The court found aggravating factors one, N.J.S.A. 2C:44-1(a)(1), "[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner"; three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense"; six, N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"; and nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law." The court did not find any mitigating factors and, as a result, determined the aggravating factors "clearly and convincingly predominate."

The court explained why it found aggravating factor one:

> The language of [a]ggravating [f]actor [one] says including whether or not committed in an especially

---

[3] Defendant, born in 1989, will become eligible for parole at age fifty-six.

heinous, cruel or depraved manner. I don't get that far because I do not have to. The circumstances of this offense are such that the phrase "senseless murder" applies here in spades. . . . There was no reason for [the victim] to die alone in a pool of his own blood on the floor of this convenience store [sic]. The robbery was completed. His shooting was an act of braggadocio. In point of fact one of the witnesses said this defendant entered the car and said "I shot the motherfucker." . . . But whoever shot [the victim] did so senselessly, just to be able to get in the car and tell his cohorts "I shot the motherfucker. But don't worry, he's not going to die, I only shot him in the leg." . . .

The guy's done, the money's in the pockets. At least one of the actual armed robbers has already exited the store [sic], when he is shot and dies three days later, as a consequence.

"An appellate court should disturb the sentence imposed by the trial court only in situations where the sentencing guidelines were not followed, the aggravating and mitigating factors applied by the trial court are not supported by the evidence, or applying the guidelines renders a particular sentence clearly unreasonable." State v. Roach, 146 N.J. 208, 230 (1996).

"[A]ggravating factor one must be premised upon factors independent of the elements of the crime and firmly grounded in the record." State v. Fuentes, 217 N.J. 57, 63 (2014); see also State v. O'Donnell, 117 N.J. 210, 215 (1989). (factor one applied in a manslaughter case because the defendant intentionally inflicted pain and suffering in addition to causing death); State v. Soto, 340 N.J.

31

Super. 47, 71-72 (App. Div. 2001) (factor one applied in an aggravated manslaughter and felony murder case where the defendant brutally and viciously attacked the victim).

Here, the sentencing court improperly considered the "murder" of the victim in finding aggravating factor one. The court described the murder as "senseless" and "an act of braggadocio." Defendant, however, was acquitted of purposeful and knowing murder, and the court therefore admittedly did not know who fired the fatal shot. Thus, the lack of a reason for the killing should not have been considered as an aggravating factor. See State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989) ("Although a defendant may be vicariously accountable for the crimes his accomplice commits, he is not vicariously accountable for aggravating factors that are not personal to him.").

The court also engaged in prohibited "double counting" by considering the death of the victim as an aggravating factor. A court may not consider one of the required elements of the offense charged as an aggravating factor. See State v. Yarbough, 100 N.J. 627, 633 (1985) (facts that the legislature has incorporated into the Code as part of the original grading of the offense are not to be weighed as aggravating and mitigating factors to arrive at the appropriate sentence); see also State v. Link, 197 N.J. Super. 615, 620 (App. Div. 1984)

A-2626-15T2

(where a specific fact is an essential element of a crime, "that element may not be used as an aggravating factor to impose a custodial sentence that is longer than the presumptive term or to impose a period of parole ineligibility").

"It is well-settled that where the death of any individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes." State v. Carey, 168 N.J. 413, 425 (2001). Because defendant was convicted of felony murder, the fact that the victim died should not have been considered as an aggravating factor.

We affirm the convictions, but remand for another sentencing hearing without consideration of aggravating factor one at which the court should set appropriate monetary penalties. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION