# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3262-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

L.L.,[1]

    Defendant-Appellant.

_____

Argued October 7, 2020 – Decided January 4, 2021

Before Judges Fuentes, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 14-12-1872.

Patrick J. Jennings argued the cause for appellant.

Ian C. Kennedy, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the brief).

---

[1] We use initials to protect the privacy of the victim and pseudonyms for ease of reference. See R. 1:38-3(c)(9); see also N.J.S.A. 2A:82-46.

PER CURIAM

Tried to a jury, defendant L.L. was convicted of sexually assaulting and endangering the welfare of his niece, K.B. (Kendra Berry), on multiple occasions. Defendant was sentenced to an aggregate thirty-year prison term. On this appeal, defendant primarily challenges the denial of his pretrial motions and various evidentiary rulings during the trial. His sentencing argument is limited to his endangering conviction.

More particularly, defendant raises the following points[2] for our consideration:

> I. THE [TRIAL] COURT . . . ERRED IN DENYING [DEFENDANT]'S MOTION TO SUPPRESS HIS CUSTODIAL STATEMENT AS IT WAS ELICITED IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS UNDER THE FOURTH AMENDMENT AND ART[ICLE] I, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION.
>
> II. THE [TRIAL] COURT . . . BELOW ERRED IN DENYING [DEFENDANT]'S MOTION TO SUPPRESS HIS CUSTODIAL STATEMENT BECAUSE IT WAS TAKEN IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENT[S] AND ART[ICLE] I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION.

---

[2]  Defendant's point headings fail to state "the place in the record where the opinion or ruling in question is located or [that] the issue was not raised below . . . ." See R. 2:6-2(a)(6).

A-3262-17T2

III.    [DEFENDANT]'S CONVICTION MUST BE OVERTURNED BECAUSE THE LEAD DETECTIVE IMPROPERLY TESTIFIED ABOUT HIS INTERROGATION TACTICS AND HIS PERSONAL BELIEF ABOUT [DEFENDANT]'S TRUTHFULNESS.
[(Partially raised below)]

IV.    [DEFENDANT]'S CONVICTION MUST BE OVERTURNED BECAUSE THE FRESH COMPLAINT EVIDENCE PRESENTED TO THE JURY WAS IMPROPER AND HIGHLY PREJUDICIAL.

A.    THE STATE INTENTIONALLY ELICITED TESTIMONY ABOUT THE FRESH COMPLAINT DISCLOSURE TO D[.]Z[.] DESPITE THE COURT'S ORDER PRECLUDING ITS DIS-CLOSURE.

B.    THE FRESH COMPLAINT EVIDENCE FROM V[.]R[.] SHOULD HAVE BEEN BARRED AND, NOTWITHSTANDING, HER TESTI-MONY AT TRIAL EXCEEDED WHAT IS PERMISSIBLE PURSUANT TO THE FRESH COMPLAINT RULE.
[(Partially raised below)]

V.    THE STATE IMPROPERLY BOLSTERED THE CREDIBILITY OF K.B. BY ELICITING TESTIMONY ABOUT AN IRRELEVANT AND HIGHLY PREJUDICIAL TATTOO SHE ACQUIRED IN RELATION TO THE ALLEGED SEXUAL ASSAULT.
[(Not raised below)]

VI. THE TRIAL COURT ERRED IN BARRING EVIDENCE PURSUANT TO THE RAPE SHIELD LAW THAT WENT TO THE CRUX OF THE DEFENSE.

A. THE [TRIAL] COURT . . . ERRED IN REDACTING [DEFENDANT]'S STATEMENT AND PRECLUDING TESTMONY ABOUT THE ALLEGED VICTIM'S SEXUAL ORIENTATION AS SUCH EVIDENCE IS NOT COVERED BY THE RAPE SHIELD STATUTE AND IT WAS PERTINENT TO [DEFENDANT]'S DEFENSE IN THE CASE.

B. THE [TRIAL] COURT . . . ERRED IN REDACTING [DEFENDANT]'S STATEMENT AND PRECLUDING TESTIMONY ABOUT THE ALLEGED VICTIM LOSING HER VIRGINITY AS IT WAS HIGHLY MATERIAL TO THE DEFENSE AND WAS NOT PROFERRED TO DEMEAN THE ALLEGED VICTIM OR INVADE HER PRIVACY.

C. [DEFENDANT] WAS DENIED A FAIR TRIAL AND HIS SIXTH AMENDMENT RIGHT TO TESTIFY IN HIS OWN DEFENSE BECAUSE THE TRIAL COURT APPLIED ITS RAPE SHIELD RULINGS TO [DEFENDANT]'S AFFIRMATIVE TESTIMONY AND PREVENTED HIM FROM SUFFICIENTLY TESTIFYING IN HIS OWN DEFENSE.

A-3262-17T2

VII. [DEFENDANT] WAS DENIED A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION AND THE NEW JERSEY CONSTITUTION AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE A COMPUTER FORENSIC ANALYSIS REPORT UNTIL THE EVE OF TRIAL.

VIII. [DEFENDANT] WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES AND NEW JERSEY CONSTITUTIONS AS A RESULT OF THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRORS.

IX. THE [TRIAL] COURT . . . ERRED IN FAILING TO MERGE THE EIGHTH COUNT AND ORDERING A CONSECUTIVE SENTENCE ON THAT COUNT.

X. THE RECORD BELOW FAILS TO ESTABLISH THE GUILT OF [DEFENDANT] BEYOND A REASONABLE DOUBT THROUGH LEGALLY COMPETENT AND FACTUALLY SUFFICIENT EVIDENCE, RE[QU]IRING THE ENTRY OF A JUDGMENT OF ACQUITTAL BY THIS COURT.

Based on our review of the extensive record on appeal, in light of the applicable law, we reject defendant's contentions and affirm.

I.

During the five-day trial, the State presented the testimony of Kendra; her best friend and fresh complaint witness, V.R. (Valerie); and two law enforcement officers. The State introduced in evidence numerous exhibits,

A-3262-17T2

including photographs that depicted the private parts of defendant, his wife, A.L. (Ann), and Kendra; sex toys; and defendant's video-recorded statement to police. Defendant testified on his own behalf and presented the testimony of three character witnesses, including his wife.

We summarize the pertinent facts from the trial testimony. Kendra was twenty-two years old when she testified. She described her devolving relationship with defendant, who is her father's half-brother, over the course of two trial days.

All her life, defendant and Kendra spent time together during holidays and at dinners, but "always with the family." At some point, defendant took Kendra and her brother out shopping to select their birthday and Christmas presents. By the time Kendra was attending middle school, however, defendant began taking her to the mall and restaurants, without her brother. Defendant described those occasions as his "niece bonding time alone with [her]." Kendra "looked up to [defendant]." They "were very close." They "would talk about everything."

When her eighth-grade school year was ending and Kendra was still thirteen years old, defendant began asking questions about her boyfriends and sex life. In turn, Kendra asked defendant questions about sex because "he was always talking about sex so [she] figured he would know the answer[s]."

Kendra's relationship with defendant markedly changed when defendant sent Kendra text messages requesting photographs of her breasts. Initially assuming defendant was joking, Kendra did not respond. But when defendant persisted, she complied. Kendra was fourteen years old when those requests began. Over the course of the following year, defendant asked Kendra for photographs of her breasts "all the time." Kendra complied.

Kendra further testified that defendant touched her breasts "underneath the bra," on more than twenty occasions, when she was between the ages of fourteen and seventeen. That conduct continued most often at Kendra's home, but occasionally at defendant's house and in his car.

Just prior to Kendra's fifteenth birthday, defendant asked Kendra whether she had tried "sex toys." When Kendra replied that she did not have a sex toy, defendant said he would purchase a "dildo" for her. The next week, defendant purchased sex toys at an adult store while Kendra remained in the car. Defendant showed Kendra how to use one of the toys.

On the way back to Kendra's home that evening, defendant parked at a train station so defendant could "see and touch" Kendra's breasts. This time, defendant lifted Kendra's shirt and put his mouth on her breasts. He also touched her vagina. After "a little bit," defendant kissed Kendra and told his niece she

7

"was a good kisser." When they arrived at Kendra's home, defendant lifted Kendra's shirt and kissed her breasts before she left his car. They also discussed how Kendra could bring the "dildos" into the house without her mom noticing.

A few days later, Kendra sent defendant a text message, stating she "didn't want that to happen again." Defendant assured her that "he wouldn't do it again." The next time they were together, Kendra specifically expressed she "didn't want him to touch [her] vagina." Defendant persistently asked whether he could continue to touch her breasts. Kendra responded that was "okay" because she didn't want to "upset him" and "ruin" their relationship.

After Kendra's fifteenth birthday, defendant began sending text messages and emails attaching photographs of his penis, and naked pictures of his wife. Defendant also sent Kendra a video of Ann performing oral sex on him, and a link to a pornographic website.

Kendra detailed their final sexual encounter, which occurred in May 2013, when Kendra was seventeen years old. Defendant went to Kendra's home to take her to dinner. Asking if he could see the bearded dragon pet he had purchased for her, defendant and Kendra entered her bedroom. Defendant sat on Kendra's bed, brought her over, lifted her shirt and touched her breasts. He

then unbuttoned her pants and inserted his finger in her vagina. Kendra "tightened [her] body up," and defendant removed his finger.

While Kendra used the bathroom in her mother's room, defendant waited on her mother's bed. When Kendra exited the bathroom, defendant placed Kendra on the bed and put his mouth on her vagina for about "about ten seconds." Kendra got up and said: "Let's go to dinner." Defendant told Kendra "he couldn't wait until [she] turned eighteen to fuck [her]." After dinner, as they were driving home, defendant put his hand down Kendra's pants, inserted his finger in her vagina, and placed his finger in his mouth.

During the next week or so, Kendra blocked defendant's number from her cellphone, and blocked him from all her social media accounts. On June 14, 2013, defendant went to Kendra's house and asked why she had blocked him, and whether Kendra "had told anyone that would cause any trouble." Kendra said she had not told anyone. At various times over the course of the abuse, however, Kendra had confided in Valerie. On June 18, Kendra gave a statement to Detective Kelly Krenn of the Bergen County Prosecutor's Office (BCPO), recounting defendant's abuse.

Shortly after Kendra's interview on June 18, 2013, Krenn and two local police officers went to defendant's home. Defendant voluntarily agreed to

accompany the officers to the BCPO for an interview. After waiving his Miranda[3] rights, defendant gave a statement to police. Defendant denied touching Kendra inappropriately, but he corroborated many of Kendra's allegations. In that regard, defendant minimized his conduct or claimed she was the initiator.

Here are but a few examples: defendant acknowledged he engaged in conversations of a sexual nature with Kendra, but said she initiated those discussions; Kendra showed him her breasts, but did so because she was concerned about the appearance of veins; defendant sent Kendra a photograph of his "pubic trimming" because she had inquired about that type of personal grooming; defendant sent Kendra a video of a girl masturbating because "she had questions about masturbation." Defendant acknowledged he purchased a "dildo" for Kendra's fifteenth birthday but said she had asked him to do so. Defendant further acknowledged Kendra sent him photographs of her breasts and he sent photographs of Ann posing topless. Defendant said the photographs were exchanged at Kendra's request.

Defendant was arrested at the conclusion of his statement. Police thereafter searched defendant's computer, and Kendra's computer and

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3262-17T2

cellphones. Among other items seized from both computers, police found photographs of Kendra in a bra and her bare breasts; photographs of defendant's penis; nude photographs of Ann; and a still image from a video of defendant receiving oral sex from Ann. Nothing of evidentiary value was recovered from Kendra's cellphones.

Defendant's trial testimony was consistent with his statement. Two of his long-time acquaintances and Ann told the jury defendant has a reputation for telling the truth.

After deliberating about half a day, the jury returned a guilty verdict on seven counts charged in the nine-count Bergen County indictment, as follows: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(3)(a) (counts two and three); third-degree criminal sexual contact, N.J.S.A. 2C:14-3(a) (counts four and five); third-degree endangering the welfare of a child (EWC), N.J.S.A. 2C:24-4(a), as a lesser-included offense of second-degree EWC (count eight); and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (count nine). The jury acquitted defendant of third-degree criminal sexual contact, N.J.S.A. 2C:14-3(a) (count six). The third-degree EWC offense charged in count seven was not

submitted to the jury for its consideration. The judge sua sponte dismissed that count at the end of the State's case, finding it duplicative of count eight.

On February 2, 2018, the trial judge sentenced defendant to an eighteen-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on count one, and a consecutive eight-year prison term on count two. Pertinent to this appeal, the judge also sentenced defendant to a consecutive four-year prison term on count eight. The sentences on the remaining counts were ordered to run concurrently with each other and concurrently with the sentences imposed on counts one, two, and eight. Defendant's sentence included registration under Megan's Law, parole supervision for life, restitution, and the requisite fines. Following defendant's sentencing, he filed this appeal.

## II.

Although defendant raises a litany of trial errors in his merits brief, during argument before us, he primarily focused on the "egregious violations" of his constitutional rights in the taking of his statement. We therefore commence our review with the contentions asserted in points I and II.

The trial judge conducted a pre-trial hearing on the admissibility of defendant's videotaped statement to Krenn and the other officers. See N.J.R.E. 104(c). The State presented the testimony of Krenn, and introduced in evidence

the video recording of defendant's statement[4] and signed <u>Miranda</u> form. Defendant and Ann testified on defendant's behalf.

According to Krenn, on June 18, 2013 at 3:30 p.m., he and two officers drove to defendant's home in an unmarked car. Earlier that day, Kendra had given her statement detailing her allegations against defendant. Police did not have a warrant for defendant's arrest and had not made a "pre-determin[ation] to arrest him."

When Ann answered the door, Krenn asked to speak with defendant; Ann mentioned nothing about defendant's medical procedure. When defendant came to the door, Krenn asked if he would step outside so that they could speak in private "to avoid embarrass[ing]" defendant. As they approached the officers' car, Krenn told defendant they "were conducting an investigation" and wanted to speak with him about "incidents that had occurred" involving the Berry family. Defendant asked for more information, but Krenn said he would rather continue their conversation at the BCPO.

When asked whether he would accompany them, defendant "voluntarily agreed," stating: "He had no problem." No threats were made for defendant to do so. Defendant was not handcuffed; he was not under arrest; and he placed

---

[4] The record on appeal does not contain the video recording.

himself in the rear seat of the car. Defendant mentioned he had undergone a medical procedure earlier. Defendant neither elaborated as to the nature of the procedure nor expressed any concern about continuing the conversation with the officers. Defendant did not appear to be under the influence of alcohol or drugs; he spoke clearly to the officers and responded to their questions.

After obtaining defendant's pedigree information, Krenn began to administer Miranda rights. When defendant interrupted and asked whether he was under arrest, Krenn said: "Not at this point. We don't even know what you're gonna say." Defendant assured detectives he was "gonna give [them] one hundred percent honesty . . . so it's not a problem," and Krenn reiterated that the officers needed to "make sure" they read defendant his Miranda rights. Pertinent to this appeal, defendant responded: "But then . . . okay, I understand that. But then I need a lawyer. . . . But I'm not lawyering up, I'm not doing anything like that . . . I'm just saying." Krenn then explained defendant "at any time" could "lawyer up," and read defendant each Miranda right. Defendant indicated he understood his rights and agreed to waive them by initialing and signing the Miranda rights form. Defendant also verbally expressed that he was willing to speak with the officers.

A-3262-17T2

The police officers interrogated defendant for about two and a half hours. The transcript of the interrogation spanned 163 pages. On page thirty-four, after defendant was advised that a computer analyst would review all his text messages, the following exchange occurred:

> DEFENDANT: Let me just ask you one more question before I go any further.
>
> KRENN: Okay.
>
> DEFENDANT: If I ask for a lawyer right now, I'm just asking, I'm not saying I want a lawyer right now.
>
> KRENN: Okay.
>
> DEFENDANT: If I ask for a lawyer right now, am I being arrested?
>
> KRENN: I don't know, I would have to run it by . . . my bosses.

When defendant asked whether he could leave, Krenn again responded he would have to "check with [his] bosses." After detectives explained they were "trying to figure out the story[,]" defendant continued to respond to the officer's questions, minimizing his conduct and denying digitally penetrating Kendra's vagina. Defendant did not invoke his right to counsel during the questioning.

During the interrogation, defendant was provided water and permitted to smoke a cigarette outside the interview room. Defendant also was permitted to

15

retain his cellphone. In fact, he sent text messages to his wife during the questioning.

Defendant's wife testified to a different version of the officers' arrival at her home. Ann said defendant was asleep, having had a colonoscopy earlier that day. She asked the officers if defendant could call them later. The officers denied Ann's request, and told her they needed to speak with her husband immediately. When defendant was outside, Ann heard the officers state they needed to speak with him about his sister-in-law. Despite her calls and texts, Ann did not hear from defendant until about three hours after he left.

Similar to Ann's testimony, defendant testified he had a colonoscopy earlier that day and was sleeping at the time the officers arrived at his home. The officers said they wanted defendant to go with them and answer some questions about his sister-in-law. Because he just had a colonoscopy and was feeling "groggy" and "tired," defendant asked whether his wife could "take [him] later . . . after dinner." The officers denied defendant's request. Defendant acknowledged the officers never said he was "required" to accompany them to the BCPO. But defendant testified he was never advised he could refuse, claiming he "really didn't have a choice but to go with them."

When he gave his statement, defendant was aware his interview was audio and video recorded. As his Miranda rights were read to him, defendant thought he was "under arrest." After the officers clarified the reason for informing defendant of his Miranda rights, however, defendant concluded he was not "being arrested at that time." Defendant said he was "afraid" that if he did not answer the detectives' questions, he would "get arrested and go to jail." Defendant testified the officers never told him he was free to leave.

Defendant acknowledged he understood his Miranda rights and signed the waiver form. He claimed when he told the officers, "I'm not lawyering up," he meant, "I'm willing to cooperate, but I need a lawyer." Defendant explained he "was definitely willing to talk to [the officers], but [he] wanted a lawyer there because" he "didn't know if [he] was being arrested." He felt "[he] need[ed] a lawyer there to protect [him]."

In his twenty-six-page written opinion, the judge rejected defendant's two-fold argument that he was illegally arrested in violation of the Fourth Amendment, and his Miranda rights were violated in contravention of the Fifth Amendment. In doing so, the judge squarely addressed the issues raised in view of his detailed recitation of the testimony adduced at the hearing and the governing law.

17

Regarding defendant's argument that he was illegally arrested, the judge initially recognized there was "no dispute at the time the detectives arrived at defendant's home on June 18, 2013, they did not have probable cause to arrest him." The judge found Krenn credible "not only as to the events leading up to his arrival at defendant's house, but also as to the conversations with defendant at the house and en[]route to the BCPO."

Conversely, the judge discredited defendant's testimony "that he felt compelled to go with the detectives to the BCPO; that he believed he had no choice but to go with them; and that he was still 'groggy' or otherwise debilitated from an earlier medical procedure . . . ." To support his assessment, the judge cited the video recording of defendant's interview, during which defendant displayed "no apparent disability or indication that [he] was affected by an earlier medical procedure." Instead, defendant was "attentive and keenly alert; [he was not] 'dozing off' or lethargic; nor [wa]s his speech slurred."

The judge further found:

> Krenn did not arrive at defendant's residence with the purpose to arrest him, but to obtain information from him. No physical force, emotional cajoling, or trickery was employed to lure defendant to the BCPO; and the video record reveals that defendant was not suffering from any condition which the detectives preyed upon, knowing that he was impaired, unable to understand

what was occurring, or make a rational decision to voluntarily go with them to the BCPO.

Accordingly, the judge concluded based on "the totality of circumstances surrounding the initial encounter at defendant's residence, en[]route to the BCPO, and at the commencement of the interview process, defendant was not in custody nor was he illegally seized from his home."

Citing our Supreme Court's decision in State v. P.Z., the judge further recognized an individual need not be formally arrested for Miranda purposes. 152 N.J. 86, 103 (1997). Instead, courts must consider whether a suspect's freedom has been significantly deprived. Ibid. After comprehensively examining defendant's statement, the judge determined "[t]he beginning of the interview can be characterized as non-custodial."

Referencing the exchange that commenced on page thirty-four of the transcript, the judge correctly recognized "the setting evolved into a custodial interrogation." The judge then scrupulously analyzed the administration of Miranda rights, rejecting the suggestion that defendant equivocated in his request for an attorney. The judge elaborated:

> Having had the op[p]ortunity to view the videotaped interview, including the tone and demeanor of defendant during the interview and the context of the statement regarding his inquiry regarding an attorney, that particular statement was not a request for an

attorney. Defendant merely asked about the procedure if he requested an attorney which is readily distinguished from other statements considered to be requests for counsel. See Maglio v. Jago, 580 F.2d 202, 203 (6th Cir. 1978) ("Maybe I should have an attorney."), and United States v. Clark, 499 F.2d 802, 805 (4th Cir. 1974) ("I had better talk to a lawyer."). Moreover, there is no dispute that defendant was told that he had a right to a lawyer and could have requested an attorney. Defendant's statement was not such a request nor was the statement at the beginning of the interview, "I'm not lawyering up," a request for an attorney, despite his testimony to the contrary.

The judge concluded: "Based on the totality of the circumstances, the State . . . demonstrated beyond a reasonable doubt that defendant was apprised of his Miranda rights and that he knowingly and intelligently waived those rights." The judge entered an accompanying order denying defendant's motion to suppress his statement to the officers.

Defendant reprises his arguments before us. Defendant primarily contends he was illegally arrested when the interrogation began and, in any event, the exchanges with Krenn quoted above demonstrate he invoked his right to counsel which, in turn required the detective to cease any interrogation. We disagree substantially for the reasons expressed by the trial judge in his thorough written opinion. We add only the following.

20

In reviewing a suppression ruling, we are mindful we must uphold a trial court's factual findings, "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence" if they are supported by sufficient credible evidence in the record. State v. S.N., 231 N.J. 497, 514 (2018) (citing State v. S.S., 229 N.J. 360, 379 (2017)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." State v. Dunbar, 229 N.J. 521, 538 (2017).

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7, of the New Jersey Constitution protect "[t]he right of the people to be secure . . . against unreasonable searches and seizures." "A seizure occurs if, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.'" State v. Sloane, 193 N.J. 423, 429 (2008) (alteration in original) (quoting State v. Stovall, 170 N.J. 346, 355 (2002)).

When evaluating the reasonableness of a detention, the "totality of circumstances surrounding the police-citizen encounter" must be considered. State v. Privott, 203 N.J. 16, 25 (2010) (citation omitted). "There is no simple test for determining at which point a prolonged investigative stop turns into a de facto arrest, but important factors include unnecessary delays, handcuffing the

suspect, confining the suspect in a police car, transporting the suspect, isolating the suspect, and the degree of fear and humiliation engendered by the police conduct." State v. Shaw, 237 N.J. 588, 612-13 (2019) (citing State v. Coles, 218 N.J. 322, 344 (2014)).

Here, the trial judge considered the "totality of the circumstances" and found defendant voluntarily accompanied the detectives to the BCPO. The judge specifically found Krenn's testimony that defendant voluntarily accompanied detectives "credible," and defendant's testimony that he was forced to accompany detectives "not credible." We defer to those findings where, as here, they are supported by the record. We therefore conclude defendant's Fourth Amendment rights were not violated.

"In the context of custodial interrogation, once a defendant clearly and unambiguously invokes his right to remain silent, interrogation must cease." State v. Maltese, 222 N.J. 525, 545 (2015) (citing State v. Diaz-Bridges, 208 N.J. 544, 564 (2012)). "When a suspect's words are ambiguous, th[e] Court has permitted police to follow up by asking questions that are designed to clarify the meaning of those words." State v. Alston, 204 N.J. 614, 623 (2011). "Appellate courts considering whether a suspect has invoked or even ambiguously invoked the right to remain silent must consider the totality of the circumstances,

including all of the suspect's words and conduct." Diaz-Bridges, 208 N.J. at 569.

Defendant was not reluctant to speak with the officers. On the contrary, he waived his Miranda rights, and spoke openly about his relationship with Kendra. Indeed, at multiple times throughout the interrogation, defendant volunteered information without prompting from detectives. We are therefore satisfied from our review of the record that the trial judge correctly determined defendant's Fifth Amendment rights were not violated.

III.

Turning to point III, defendant claims the trial judge improperly permitted Krenn to testify at trial about the "deception tactics" he utilized when questioning defendant, and the opinion he expressed during the interrogation that defendant was not truthful. We disagree.

During Krenn's direct examination, the prosecutor elicited testimony from Krenn about the interrogation "tactics" he used here, where the allegations involved sexual assault on a minor. Krenn told the jury he used "minimization" of defendant's "role" in the acts, and "blamed [Kendra] throughout the interview," referring to her as "the aggressor." Krenn further testified he "used

deception" by informing defendant the cellphones would reveal photographic evidence, although Krenn "didn't believe that because the stuff was deleted."

Krenn told the jury he employs these tactics due to the "sensitive subject" matter that "[n]o one wants to talk about it." Krenn elaborated:

> It's not like you're confessing to, you know, a bank robbery or a burglary, or something like that. This is a very serious sensitive crime and it's very difficult, so we give them a minimization theme to kind of lessen the blow for them so they can say, well it was . . . you know, I did it, but it wasn't my fault it was the victim's fault.

Defense counsel did not object to the prosecutor's inquiry.

After the video recording of defendant's interrogation was played for the jury, and before court recessed for the day, the judge issued the following instruction:

> There is one thing I just want to leave you with, with respect to this tape and this testimony. You heard Detective Krenn say there are various techniques that they use, which . . . and he'll go into more, I'm sure, on direct and cross-examination. One of the things that you heard during the tape was that the detective saying that they believe [Kendra] and they don't believe the defendant. Whatever anybody else thinks or believes about any of the witnesses is irrelevant. Only you, the jury, are the ones who make determinations as to credibility. So, because a particular technique is used saying we believe you, we disbelieve you, we believe that person, only you make credibility determinations.

24

On cross-examination, defense counsel further questioned Krenn about the tactics the detective employed. In addition, defense counsel specifically asked Krenn whether he "accept[ed] as true" some aspects of defendant's statement, including that defendant sent Kendra "certain pictures" and gifted her "the sex toy." Counsel then pressed Krenn about the "numerous, numerous, numerous denials of any touching" that Krenn was not "willing to accept." Krenn agreed, explaining that conduct was the only aspect of Kendra's statement that defendant would not admit. Counsel asked: "[A]nd until he did [admit that conduct], in your estimation, [defendant] was not being totally honest with you, right?" Krenn responded: "At that point, I didn't know . . . if he was being totally honest with me."

In response to that line of inquiry, the prosecutor redirected Krenn as to why he did not believe defendant's denials. Overruling defense counsel's objection, the judge permitted Krenn to testify about defendant's evolving account – from total denial to admissions – that matched some of Kendra's account.

At the conclusion of Krenn's testimony, the judge again instructed the jury: "Obviously, I've said this before, just because a detective or somebody else says they believe or don't believe [w]hat the defendant or anybody else says,

is irrelevant for your purposes. It's up to you to determine credibility." And, during his final jury charge on the jury's function, the judge instructed: "You, and you alone, are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony." See Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014).

We apply a deferential standard of review to the trial court's evidentiary rulings. State v. Scott, 229 N.J. 469, 479 (2017). We will only reverse if the trial court's evidentiary rulings were "so wide of the mark that a manifest denial of justice resulted." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). Where there was no objection to the claimed error at trial, we review the matter for plain error, and may reverse only if the error was "clearly capable of producing an unjust result." R. 2:10-2; see also State v. R.K., 220 N.J. 444, 456 (2015).

As noted, defendant did not object to the elicitation of Krenn's interrogation techniques on direct examination and made further inquiry of those "tactics" on cross-examination. We discern no error, let alone plain error, in the admission of that testimony.

Even if the detective's testimony improperly expressed his belief as to defendant's veracity, see State v. Tung, 460 N.J. Super. 75, 101-02 (App. Div.

2019) (recognizing a witness may not offer an opinion on another witness's credibility), or guilt, see State v. Frisby, 174 N.J. 583, 593-94 (2002) (finding a police officer testifying as a fact witness was not allowed to opine regarding whether the defendant committed the crime), the trial judge's timely and repeated jury instructions explained both the purpose of the testimony and clearly explained that the jurors were the "final arbiters" of credibility. The jury was presumed to have followed the trial court's instructions. State v. Smith, 212 N.J. 365, 409 (2012).

## IV.

We next consider defendant's contentions raised in point IV, that the trial judge erroneously: (1) admitted the fresh complaint testimony of Valerie; and (2) failed to grant a mistrial after the State elicited testimony about Kendra's disclosure to D.Z. (Dana), whom the judge had precluded from offering fresh complaint testimony. We likewise review these evidentiary decisions under an abuse of discretion standard, Scott, 229 N.J. at 479, and we review for plain error, where there was no objection raised before the trial court, Rule 2:10-2.

The fresh complaint doctrine allows the State to admit "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is

fabricated." R.K., 220 N.J. at 455. The victim must make the statement "spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." Ibid. "Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted; the fresh complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'" Id. at 456 (quoting State v. Bethune, 121 N.J. 137, 146 (1990)).

Prior to trial, the judge conducted an N.J.R.E. 104(a) hearing on the State's motion to admit fresh complaint evidence from Valerie and Dana. Valerie testified that Kendra was her "best friend"; they "tell each other everything." During their freshmen year in high school, Kendra disclosed that something was upsetting her about defendant. Valerie recounted four separate conversations over the next few years, during which Kendra said defendant: (1) requested naked photographs of Kendra; (2) touched her breast and "put his hand in her pants" at the train station; (3) "slid[] his hand up her shirt" when she babysat his daughter; and (4) digitally penetrated Kendra and "tried to put his head down in her vagina."

Kendra told Valerie about each incident "within a reasonable amount of time" after they occurred. "Not as soon as they happened, but . . . about a week

28                                                                    A-3262-17T2

later. Whenever [Kendra] could, whenever [they] saw each other . . . ." Valerie recalled that Kendra was "very upset" during their conversations and "really embarrassed."

During the hearing, the State also presented the testimony of Dana, who was employed by Kendra's school district as a student assistance coordinator and advisor. After receiving information that Kendra might have been sexually abused by a family member, Dana called Kendra into her office and directly questioned her about the allegations. Although Kendra physically recoiled, she denied the abuse. About ten days later, Kendra told Dana that she was being abused. The following day, Dana met with Kendra, her mother, and the school resource officer, who was also a local police officer. Kendra detailed the multiple sexual encounters she had with defendant.

In a written opinion accompanying the September 25, 2017 order, the trial judge cogently examined the testimony adduced at the hearing and cited relevant case law. The judge granted the State's motion to permit fresh complaint testimony of Valerie but denied the motion as to Dana. According to the judge: "[Valerie] and [Kendra] are childhood friends. [Valerie]'s testimony that they 'tell each other everything' is credible. Contrary to defendant's allegations, the disclosures were not prompted by interrogation or questioning from [Valerie]

but were impromptu disclosures during conversations between two friends." Because Kendra's initial disclosure was made shortly after the incident, the judge rejected defendant's argument that the disclosure was not made within a reasonable time after the incidents allegedly occurred.

Conversely, the judge found the relationship between Dana and Kendra "was more akin to a therapist and patient, rather than a close confidant." Noting Dana "sought out" Kendra and made "at least five to seven [unsuccessful] attempts to make [Kendra] disclose," the judge found Kendra's "disclosure to [Dana] after the approximate [ten-]day period of silence, d[id] not qualify for admission" under the fresh complaint rule.

## A. Valerie's Trial Testimony

At trial, the State's direct examination of Valerie was limited to her close relationship with Kendra; the victim's disclosure that defendant was "molesting her" when they were thirteen or fourteen years old; and Kendra's demeanor when she made that initial disclosure. Defendant posed no objection to those inquiries. Immediately following the prosecutor's examination, and during the final instructions, the judge correctly issued a limiting instruction that tracked the instructions in the model jury charge. See Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007).

On appeal, defendant contends Valerie's fresh complaint testimony should have been barred because she was unable to recall "the time of year" Kendra's disclosures were made, thereby "negat[ing] the claim that the disclosures were made within a reasonable time after the alleged criminal acts." For the first time on appeal, defendant claims Valerie's testimony about Kendra's demeanor when she disclosed defendant's abuse exceeded the bounds of the fresh complaint rule.

Based on our review of the record, we are satisfied the trial judge properly admitted Valerie's pointed testimony at trial. Valerie gave no details about the disclosure, other than Kendra said: "Her uncle . . . [defendant, was] molesting her"; there is no evidence in the record that Kendra's statements were coerced or forced; and the judge correctly instructed the jury on the limited purpose of fresh complaint testimony, namely, to dispel any negative inference from the victim's assumed silence – and not as proof that defendant assaulted her. We further agree with the trial judge that Kendra's disclosure was made within a reasonable period of time after the abuse occurred.

Nor are we persuaded by defendant's belated claim that Valerie improperly testified about Kendra's demeanor. Notably, defendant did not object to that testimony, and on cross-examination, he asked several questions about her demeanor. In any event, Valerie's testimony in this regard was based

31

on her personal observations of her best friend and was highly relevant in evaluating the victim's credibility. Indeed, pursuant to the fresh complaint model jury charge, the judge instructed the jury: "You may consider the conduct and demeanor of K.B. at the time of the complaint as well as her physical or mental condition." Model Jury Charges (Criminal), "Fresh Complaint.".

We therefore discern no error, let alone plain error, in Valerie's testimony. In sum, the jury was correctly instructed as to the limited purpose of Valerie's testimony, overall.

### B. Kendra's Trial Testimony Regarding Her Disclosure to Dana

Dana did not testify at trial. However, toward the end of the prosecutor's direct examination of Kendra, testimony was elicited about the victim's initial denial then eventual disclosure to Dana. After the short exchange – during which no details about the disclosure were revealed – the judge sua sponte instructed the jury to disregard Kendra's testimony that she told Dana about the abuse.

Before questioning resumed, the judge reserved decision on defendant's timely motion for a mistrial and issued the following curative instruction:

> Ladies and gentlemen, I just want to give you one caution. I know before we went to break, we had some conversations regarding disclosures. Again, I ask that you disregard, meaning that I know you heard it, but

not consider it in any of your deliberations . . . any disclosures allegedly made to any person, other than . . . I think . . . you're going to hear . . . from [Valerie] . . . in this case. But, any other alleged disclosures should not come into your deliberations at all.

The following day, the judge denied defendant's mistrial motion, finding the State did not purposely subvert his ruling; the testimony regarding Dana's involvement was brief; and the jury likely would not "remember that portion of the testimony due to the other testimony . . . ." The judge further noted he had issued a curative instruction.

On appeal, defendant reprises his argument that the prosecutor's "intentional" line of inquiry about Kendra's disclosure to Dana warranted a mistrial; he now claims the judge's curative instruction was unclear. We disagree.

The decision to grant a mistrial lies within the sound discretion of the trial court and is reviewed for an abuse of that discretion. State v. Smith, 224 N.J. 36, 47 (2016). Absent a manifest injustice, we will not disturb that decision, particularly where, as here, a curative instruction is an appropriate remedy. State v. Jackson, 211 N.J. 394, 407-09 (2012).

Based on our review of the record, we discern no basis to disturb the judge's determination that "there was absolutely . . . no intent by the State to get

33

around, or avoid, or in some way deviate from [his] order to get some testimony in that would have been otherwise barred." Indeed, Kendra's testimony regarding her disclosure to Dana was fleeting and inconsequential in light of Kendra's lengthy overall testimony. In any event, the judge issued a pointed curative instruction. We presume the jury followed that instruction. Smith, 212 N.J. at 409.

## V.

Little need be said regarding defendant's remaining challenges to his convictions, raised in points V through VIII, and X. We briefly consider each in turn.

## A.

For the first time on appeal, defendant contends the State improperly asked Kendra about the meaning of certain tattoos she acquired a few months after her disclosure. Prior to Kendra's testimony, the prosecutor advised the court and defendant, outside the jury's presence, that she intended to ask Kendra about her tattoos. Counsel posed no objection.

Kendra told the jury her tattoo, written in another language, meant "I suffered, I learned, I changed." When asked, Kendra explained: "It means I suffered through this and then I learned how it was wrong and I changed and I'm

here, you know, doing something." Kendra also said she had another tattoo, depicting a heart with wings, that meant "whatever happens to me, my heart will go on."

Defendant now claims that testimony was irrelevant under N.J.R.E. 401. In the alternative, defendant claims the tattoo testimony improperly bolstered Kendra's credibility, and its prejudicial effect outweighed its probative value and should have been precluded under N.J.R.E. 403. The State counters the testimony was relevant to prove "harm" under count seven of the indictment, which charged EWC by abuse and neglect. See N.J.S.A. 2C:24-4(a)(1). As noted, that count was dismissed at the end of the State's case.

When viewed through the prism of the plain error standard, we discern the brief exchange at the end of Kendra's testimony, late in the trial day, was not "clearly capable of producing an unjust result." R. 2:10-2. We assume defendant agreed that the testimony was not harmful, as he never objected to its admission. See State v. Nelson, 173 N.J. 417, 471 (2002) ("[It is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment") (quoting State v. Macon, 57 N.J. 325, 333 (1971)).

A-3262-17T2

B.

We are not persuaded that the trial judge erroneously barred evidence of the victim's sexual orientation and Kendra's loss of virginity, as argued in defendant's point VI. In that regard, the judge ordered defendant's statement redacted accordingly and prohibited questioning on cross-examination of the victim, "unless such information is revealed on direct examination." Again, we review these evidentiary rulings for an abuse of discretion. Scott, 229 N.J. at 479.

In essence, New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, prohibits "evidence of the victim's previous sexual conduct" in prosecutions for certain sexual offenses, including aggravated sexual assault, sexual assault, and endangering the welfare of children. N.J.S.A. 2C:14-7(a). The statute protects sexual assault victims from excessive cross-examination, guards against improper use of evidence of a victim's previous sexual experience, and preserves the integrity of trials. State v. Budis, 125 N.J. 519, 529 (1991).

An exception to the statutory exclusion exists if "evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material," meets certain other statutory criteria, and has "probative value" that "substantially outweighs . . . the probability that its admission will create undue

36

prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." N.J.S.A. 2C:14-7(a); see also State v. Garron, 177 N.J. 147, 171 (2003) (recognizing "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled"). Whether evidence of a victim's prior sexual conduct is admissible "is exquisitely fact-sensitive and depends on the facts of each case." State v. Perry, 225 N.J. 222, 238 (2016) (internal quotation marks omitted).

Defendant's contention that "sexual orientation" does not fall within the ambit of "sexual conduct" is belied by the inclusion of the term "life style" within the statutory definition of sexual conduct. N.J.S.A. 2C:14-7(f). We agree with the State that "the term, 'life style' is a[n anachronistic] synonym for sexual orientation." Clearly, Kendra's bisexuality fell squarely within the definition of sexual conduct.

Nor do we find any merit in defendant's assertion that Kendra's "statement to her uncle about losing her virginity was relevant to his state of mind and his defense on the endangering charges." Not surprisingly, defendant fails to cite any legal authority to support his claim. Indeed, defendant's mental state is not relevant under N.J.S.A. 2C:24-4(a). See State v. Bryant, 419 N.J. Super. 15, 17-

18 (App. Div. 2011). In any event, defendant testified and explained his behaviors to the jury.

C.

In point VII, defendant contends the trial judge should have declared a mistrial based on an "eve of trial" discovery violation. At issue was a report prepared by the State's expert forensic analysist, detailing an examination of three of Kendra's cellphones, and "an extraction CD that would show what was or was not found on those cellphones." Apparently, the report, dated January 9, 2017, was provided two days prior to defendant's application – before the jury had been sworn and Kendra had begun her testimony – but the disc had not yet been provided.

Although the expert's analysis yielded no inculpatory information, the defense argued it was entitled to review the disc containing the extraction and "a copy of the hard drive of each of [Kendra's] phones, potentially to send to an expert." Defense counsel acknowledged that any communications between Kendra and defendant also would have been contained on defendant's cellphone, but claimed defendant no longer had the same phone. Counsel could not articulate the precise nature of the exculpatory information he expected would

be found but speculated there could be messages to a third party, like Valerie, regarding "some . . . kind of conspiracy."

In his oral opinion that followed argument, the trial judge denied defendant's motion for an adjournment, which he deemed a motion for a mistrial because the "jury would be lost" due to scheduling restraints and defendant's understandable reluctance to waive double-jeopardy issues. The judge found the lack of inculpatory information both "relevant" and "important" factors. Acknowledging the defense had a "right" to conduct "a search for exculpatory evidence," the judge nonetheless determined that "based on the evidence presented," it was difficult to "perceive[e] what type of exculpatory information could be on . . . the text messages, if any at all." Finding the State did not "deliberate[ly] withhold[]" the discovery at issue, in view of the "volumes . . . of discovery provided over the past four years" the judge found defendant's application sought "a harsh remedy at this point."

Mistrials are an "extraordinary remedy" that trial courts should only grant to "prevent an obvious failure of justice." State v. Yough, 208 N.J. 385, 397 (2011) (internal quotation marks omitted). Generally, the decision to grant or deny a mistrial is "within the sound discretion of the trial judge." State v. DiRienzo, 53 N.J. 360, 383 (1969). Appellate courts "should not reverse a trial

court's denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" Yough, 208 N.J. at 397 (quoting State v. LaBrutto, 114 N.J. 187, 207 (1989)). When a trial court decides a mistrial motion, it "must consider the unique circumstances of the case." Smith, 224 N.J. at 47.

Applying those legal principles to the record before us, we conclude the trial judge did not abuse his discretion in denying the extraordinary remedy of a mistrial. To be sure, the expert's report and extraction disc should have been provided as "continuing" discovery under Rule 3:13-3(f). But as the trial judge aptly noted, considering defendant's inculpatory statements, it was "difficult" to discern the type of exculpatory evidence that could have been found on Kendra's cellphones, and defendant points to none on appeal.

As noted, defendant admitted sending nude photographs and videos to Kendra and giving her a sex toy. Photographs of that evidence was not recovered from Kendra's cellphones, but rather from defendant's and Kendra's computers. Having "consider[ed] the unique circumstances of th[is] case," Smith, 224 N.J. at 47, we conclude the judge did not abuse his discretion in denying defendant's request for a mistrial.

A-3262-17T2

D.

As to point VII, we reject defendant's contention that the cumulative effect of the errors committed during his trial warrants reversal. Defendant has failed to demonstrate any error or pattern of errors, rising to the level, either singly or cumulatively, that denied him a fair trial. "A defendant is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (internal quotation marks omitted).

Moreover, we decline defendant's invitation to enter a judgment of acquittal, as argued in point IX. As detailed above, Kendra's testimony, corroborated in part by defendant's statements, supports the jury's verdict.

VI.

Lastly, we consider defendant's sentencing argument, raised in point IX. Defendant claims the judge erred in failing to merge the EWC count charged in count eight with the sexual assault counts; imposing sentence on count eight consecutively to the sexual assault counts; and applying aggravating factor four, N.J.S.A. 2C:44-1(a)(4) ("the defendant took advantage of a position of trust or confidence") on count eight. We disagree.

Generally, we review a sentencing court's decision "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). We do not

41

"substitute [our] judgment" for that of the sentencing court. State v. Case, 220 N.J. 49, 65 (2014). That deference, however, "applies only if the trial judge follows the Code and the basic precepts that channel sentencing discretion." Ibid.

"At its core, merger's substantial purpose 'is to avoid double punishment for a single wrongdoing.'" State v. Romero, 191 N.J. 59, 80 (2007) (quoting State v. Diaz, 144 N.J. 628, 637 (1996)); see also State v. Miller, 108 N.J. 112, 116 (1987) (merger stems from the well-established principle that an accused who has committed only one offense "cannot be punished as if for two"). "[M]erger implicates a defendant's substantive constitutional rights." State v. Cole, 120 N.J. 321, 326 (1990).

Where the offenses are in fact indistinguishable, the resulting convictions must be merged. State v. Best, 70 N.J. 56, 61 (1976). Accordingly, EWC convictions should merge with sexual assault convictions when "the record suggests no basis for the endangering conviction beyond the sexual assault." State v. Still, 257 N.J. Super. 255, 259 (App. Div. 1992).

At sentencing, the judge rejected defendant's application for merger, finding count eight "was not based upon the sexual assault only." Instead, that count "was based upon other factors including the photographs sent, the videos

sent, the conversations between the defendant and the victim, wherein the jury was instructed, specifically, that those items could form the basis of a child endangerment . . . affecting the morals of the child."

Indeed, during his final jury charge, the trial judge astutely charged the jury on the sexual conduct committed by defendant where, as here, that conduct was not specifically alleged in the indictment. See Model Jury Charges (Criminal), "Endangering the Welfare of a Child, Sexual Conduct (Second Degree) (N.J.S.A. 2C:24-4(a)(2))" (rev. Apr. 7, 2014), n.5. We therefore reject defendant's argument that "neither the jury instructions nor the verdict sheet required the jury to specify which acts constituted the basis for the [EWC] conviction . . . ." We therefore discern no error in the judge's decision denying merger.

We also reject defendant's argument that the judge erroneously imposed a consecutive sentence on count eight by applying aggravating factor four here, where the jury acquitted defendant of the second-degree EWC charge. Recognizing that charge requires a "legal duty of care of the child," N.J.S.A. 2C:24-4(a)(2), the judge reasoned:

> Certainly, the jury did not find that there was a parental-type relationship or a relationship of responsibility, which would . . . risen this offense to a second-degree level. The court, however, . . . can consider the

43

relationship between the parties and there certainly was a breach of trust. There was clearly, in this instance, a grooming procedure, a way to get the victim . . . to trust [defendant], to be the favorite uncle.

Assessing and weighing the factors identified in State v. Yarbough, 100 N.J. 627, 642-44 (1985) – which defendant does not challenge – the judge found consecutive sentences were appropriate. The judge considered the "different type of offenses here," including: "sending photographs, sending videos, giving [Kendra] inappropriate sex toys, telling her how to use them, sending her pictures of his genitals," which "are different types, separate acts, independent of the actual touching, part of the grooming process." We discern no error in the judge's sentencing decision.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION